## THE STATE v. HOTTMAN, Appellant.

### Division Two, May 22, 1906.

1. **MURDER: Information: Several Weapons.** It is competent for an information charging murder to allege that the murder was committed by the use of more than one weapon.

2. **———: ———: Deadly Weapon: Unnecessary Charge.** It is not necessary that an information for murder allege that the weapons with which the murder was committed were deadly weapons.

3. **JURORS: Challenge to Array: In Writing.** At common law it was necessary that a challenge to the array be in writing, and this is the case also where the common-law rule has not been abrogated by statute.

4. **———: ———: Publication of Defendant's Confession.** After the panel had been selected and defendant had taken the time allowed him in which to make his peremptory challenges, his counsel moved orally to quash the panel, on the ground that since the panel had been selected defendant's confession had been published in a newspaper in the city in which the trial was being held, and that the jurors had read the published confession and had formed an opinion. Thereupon the court of its own motion examined each member of the panel and having ascertained that most of the panel had not seen or read the article and that but four of the jurors had formed an opinion from reading it, he overruled the challenge to the array, but excused the four jurors, and drew fifteen other names from which to fill up the panel, and from these fifteen four others were selected to take the place of those excused. *Held*, that, aside from the fact that the challenge to the array should have been in writing, the trial court pursued the proper course, since the jurors who had not read the published confession were not disqualified merely because it had been published.

5. **EXCEPTIONS: Appeal.** Matters of exception, in order to be reviewed in the appellate court, must be objected and excepted to at the time, and repeated in the motion for new trial.

6. **CONFESSIONS: Properly Admitted.** Prima facie defendant's confessions were admissible, and in the absence of any improper conduct on the part of the officers procuring them to induce defendant to make them by the flattery of hope or promise of immunity or reward, or the use of any threats, they were properly admitted in evidence.

7. **MURDER: First Degree: Evidence: Instructions.** Evidence, including defendant's confession, *held* sufficient to support the verdict finding defendant guilty of murder in the first degree; and the court by its instructions properly confined the jury to that offense.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford*, Judge.

AFFIRMED.

*Herbert S. Hadley*, Attorney-General, and *John Kennish*, Assistant Attorney-General, for the State.

(1) (a) It is not a valid objection to the information that it charges the assault to have been made and the wounds to have been inflicted by the use of more than one weapon. State v. Blan, 69 Mo. 319; State v. McDonald, 67 Mo. 13; State v. Thomas, 99 Mo. 235. (b) While the form of the averment sufficiently charges that each weapon was a deadly weapon, it was not necessary to allege that the weapons with which the assault was made and the wounds inflicted were deadly weapons. State v. McDonald, 94 Mo. 301; State v. Bowles, 146 Mo. 6; State v. Hyland, 144 Mo. 302. (2) The court did not err in overruling defendant's motion to quash the entire panel. State v. Collins, 86 Mo. 248; Eberhardt v. State, 47 Ga. 606. (3) The confession of defendant was properly admitted in evidence. While made in the presence of an officer of the law, it was shown to have been free and voluntary, and no promises or threats whatever were made to induce him to make it. Kelley's Crim. Law and Prac., pp. 180, 181; State v. Northway, 164 Mo. 513; State v. McClain, 137 Mo. 307; State v. Guy, 79 Mo. 430; State v. Rush, 95 Mo. 199; State v. Shackelford, 148 Mo. 493. (4) The court did not err in refusing defendant's request to instruct the jury on the law of murder in the second degree. There was no evidence tending to prove the crime of murder in the second degree, and it is the duty of the court to

submit to the jury only such grades of the offense charged as the evidence tends to prove. State v. Sneed, 91 Mo. 552; State v. Smith, 114 Mo. 406; State v. Robertson, 178 Mo. 496; State v. Henderson, 186 Mo. 473.

GANTT, J.—This is an appeal from a judgment and sentence of the criminal court of Jackson county, at Kansas City, Missouri.

On the 25th of July, 1904, the prosecuting attorney of Jackson county filed in open court an information charging the defendant with the murder, in the first degree, of Clarence Myers at said county on the 11th day of May, 1904. The information is in the exact form of that set forth in full in the opinion in State v. Maggie Myers, handed down on this day (94 S. W. 242), save and except that in the information in this case Frank Hottman, the defendant, is charged with said murder, whereas in that case Maggie Myers is charged with the same. Upon an arraignment and plea of not guilty, the defendant was put upon his trial and convicted of murder in the first degree. Motions for a new trial and in arrest of judgment were duly filed, heard and overruled and sentence pronounced from which this appeal is prosecuted.

Inasmuch as the testimony in this cause is in all material respects the same as that detailed in the statement accompanying the opinion in State v. Myers for the same murder, it is deemed unnecessary to restate it here further than to reproduce the two confessions made by the defendant, the one at Walla Walla, Washington, at which place defendant was arrested, while living there under the name of W. K. Ballard, after the homicide. The statement or confession at Walla Walla is in the words following:

"My name is Frank Hottman. I left Higginsville on the 5th or 6th of May, 1904, for Kansas City on noon train. Mrs. Myers met me at the depot. The deed was

planned at Higginsville on Mrs. Myers' last visit there. Met her several times during my stay in Kansas City. Mrs. Myers let me in at the kitchen door on the morning of the 11th of May, 1904.    We proceeded to the room where Myers was sleeping.   He was lying in bed when we came in and got up.   Myers said, 'Here you are again,' and I hit him with the butt of a billiard cue which I had brought from home with me.   He clinched me and we fell on the bed.   I was on top of him.   He struggled free and I grabbed him and held him, while Mrs. Myers stabbed him with a razor cutting his throat first.   He grew weak and I let him down on the floor and she bent over him and stabbed him again and again.   We agreed to shield one another.   I remained there about ten minutes and she let me out at the back door.   She said after the matter was quieted she would come to me. She gave me about ten dollars in money, saying it was all the money she had.   I left that morning for St. Joe, after going back to my room and sleeping for a while. On train between Kansas City and St. Joe I took off my shirt which showed blood on the sleeves and threw it away.   My hat I left in the room where the struggle had taken place, and I took Myers' hat, which I have with me now.   I stopped at St. Joe three or four days, from there I went home to Higginsville, arriving there on the last train at night.   Stopped home three days, left there on the 19th or 20th, went then to Omaha, crossing the river at Glasgow, taking Wabash train, changing near Omaha.   Bought ticket from Omaha to Walla Walla.   Arrived at Walla Walla on Tuesday, May 24th.   Stopped here several weeks, went to work on Eureka Flats and remained there until 20th of June. I make this statement because it is the truth, without fear or reward.                     FRANK HOTTMAN.''
''Witness to signature:
    ''D. H. Oldham,
    ''Chas. S. Painter.''
    196 Sup.—8

After defendant was apprehended and brought back to this State, he voluntarily made another confession, which is as follows:

"Kansas City, Mo., July 12, 1904.

"My name is George Frederick Franklin Hottman. I am usually known by the name of Frank. I was twenty years old the 22nd day of last March. I was born in Saline county, Missouri. I have been living in Higginsville, Mo., about fifteen years. I have known Maggie Myers, whose maiden name was Maggie Brock, about ten years. She was married once before to a man by the name of Payne. I think his first name was Rob. I never worked here in Kansas City. Sometime last November I came up to Kansas City and stayed here until sometime in December. While I was here I stayed part of the time at Mr. Brock's, the father of Maggie Myers; and a part of the time I stayed at the Myers' house. I didn't get any work here and then I went back to Higginsville. I came up to Kansas City again, I think it was in February, 1904, and stayed at the Myers' house a couple of days or so, then I went back to Higginsville. Sometime in April, 1904, I think it was, Maggie Myers came down to Higginsville and visited with my folks. She and I went buggy riding and were around together while she was there. We were pretty fond of each other while she was visiting us at Higginsville. The day we were out buggy riding together we talked about running away together. We had talked about it before. I wanted her to run away with me and she said she would not do that while she was married to Clarence (that's her husband's name); she then said, 'We can get rid of him, we can kill him.' I said, 'No, I don't want to do that,' and she said, 'That's the only way to do,' she said, 'It won't do to run away because Clarence will follow us;' we talked it over for sometime and talked how we had better do it; Maggie said, 'The best way is to hit him with a club,' and I said, 'I can

get a billiard cue which will be just the thing.' Then we planned that she should come on to Kansas City and I should follow in a few days and do the job. We planned that we should kill him at night while he was at home asleep. She came on home and I came as far as Odessa on the train with her. Then I went back to Higginsville. My grandfather had a billiard cue which he used as a cane. I cut a part of it off and took the heavy end of it. Maggie had been home about a week when I came to Kansas City and brought the heavy end of the billiard cue with me. I got here in the evening. Maggie Myers met me at the Union depot. We stayed there together two or three hours, I guess. We talked about killing Clarence. I told her I had the billiard cue. She said we could kill him any time we could catch him at home. She said she would let me know some night when he would be at home. We arranged to meet at the Union depot the next morning. She met me the next morning as we had agreed. We went over in Kansas City, Kansas, to a rooming house on Minnesota avenue; we stayed there together two or three hours, I guess. I came part of the way back with her. We arranged to meet each other near the post office the next day. She met me and we walked around town. We talked some about getting rid of Clarence. She said she expected him to be home every night, and said we could get rid of him any time now. We planned to do it that night. She told me to come that night to the back door a little after one o'clock and she would be there to let me in. I had a room on Union avenue opposite the depot. I registered as Ed Hartman. I left there about eight o'clock in the evening and before leaving told the clerk to have me called at 4:30 in the morning. I put the piece of billiard cue in my coat pocket. I walked around town. Didn't meet any one I knew. I had a bottle of whiskey in my pocket and took a drink or two out of it while I was walking around town. I started out to the Myers place and on the way out looked at my

watch. It was a quarter to one o'clock. I came up to the Myers house the back way through the alley to the back door. Maggie had the door open and was there waiting for me. She said, 'Keep quiet' in a whisper, 'He's awake.' We stood there a little while. She said, 'Wait awhile,' and went into the room where Clarence was and shut the door. I stood inside the kitchen for some little time and then Maggie came out into the kitchen and said, 'He is asleep.' And then we started in the room where Clarence was. He was lying in bed and just as I got into where he was he raised up and said, 'Here you are again,' and I hit him along the head with the billiard cue which I had brought with me. He clinched me and we fell on the bed. The bed broke down. I was on top of him and holding his hands. We struggled to the floor standing and out in to the other room where the stove was. He struck me and knocked me down. I got up and clinched him and we scuffled and while we were struggling I got his hands down to his side like and while we were in this position Maggie Myers came up with a razor in her hands and commenced to cut him about the throat and head. He commenced to weaken and I let him down on the floor with his face down and Maggie stabbed him a number of times in the back. He was on the floor near the sideboard. While we were struggling Clarence hollered, 'Murder', 'Let me alone,' 'Help.' He didn't holler very loud, he could not. Clarence hollered, 'Honey, help me.' When Maggie cut Clarence the blood fell on my hands and cuff. After she had stabbed him a number of times Clarence quit hollering. Then Maggie brought a pan of water into the room where Clarence lay and I washed my hands. In the struggle with Clarence one of my cuffs came off. I took the other one off while I was washing my hands and threw it on the floor. I took the cuff buttons out of my cuffs and left the cuffs there. The buttons are the same ones I gave him at Walla Walla. When I went into the house I had my hat on

and in the struggle it was knocked off. It had blood on it and I left it there and wore away one of Clarence's hats. The hat I wore away I gave to Mr. Oldham at Walla Walla. Maggie gave me the hat of Clarence which I wore away. In the struggle I dropped the piece of billiard cue and left it there. In the struggle I got my hands bruised and slightly cut. I wasn't disguised in any way when I went into the house. Did not have any mask on and did not have my face blackened. After I got my hands washed she said, 'You must not say anything about this,' and I said, 'I won't,' and she said she would tell that niggers had come in and killed Clarence. We had an understanding before Clarence was killed that she would say that niggers had broke into the house and killed Clarence. She gave me some change, I think about ten dollars. She said she would see me some time soon. I told her I would go up to St. Joseph. I left the house and went right straight to my room on Union avenue. The night man went up-stairs with me. I had on an old suit of clothes which I took off and put in my grip satchel. I laid down on the bed. Think I had been in the room about an hour when I was called. I got up and put on a suit of clothes which I had there and took a train for St. Joseph. I stayed in St. Joseph three or four days. I do not remember just how long. I stopped at a place at the edge of town. It's a two story building and the man who runs the place is a barber and has a shop down street. It was not very far from the depot. On the way to St. Joseph I took the clothes I had worn when we killed Myers out of the grip and threw them away. There was a pair of pants, a coat, a vest and shirt. All the things had blood on them. I read about the killing in the papers at St. Joseph. I went from St. Joseph to Higginsville coming through Kansas City. I stopped at Odessa and saw my uncle, Albert Wright. I told him about the killing and that I was in trouble. The next day my uncle, Albert Wright, came down to Higginsville. I told my folks

about the trouble I was in. My father gave me about $60 and after I had been home about two or three days, somewheres along there, I left and went to Glasgow, Mo., and crossed the river there. Took a train and went to Council Bluffs and from there to Omaha and then to Walla Walla. At Omaha I bought a ticket to Walla Walla and paid $35 for it. At Walla Walla I went to the postmaster and hired a box and gave the name of W. K. Ballard. I got mail out there from my uncle Albert Wright and letters from my mother. Before I left I told my uncle that I would go under the name of W. K. Ballard. I never have had epilepsy, never received a blow on the head and never had a sunstroke. I make this statement, consisting of fifteen pages, to George P. Whitsett and John B. Hayes, assistants to the prosecuting attorney, voluntarily and without any threats or promise or threats having been made to me. I make this statement of my own free will and because I want to tell the truth about the matter.

"FRANK HOTTMAN."

"Witnesses:

"George P. Whitsett,

"John B. Hayes, Jr.,

"Ed. A. Hickman."

This confession was corroborated by many witnesses as to his movements in Kansas City before and on the night after the murder, and as to his return to Higginsville and departure from there for St. Joseph and by witnesses who resided in St. Joseph. No evidence was offered on behalf of defendant. The instructions were as follows:

"1. The information in this case was filed by the prosecuting attorney on the 25th day of July, 1904, and charges the defendant with murder in the first degree.

"Murder in the first degree is the willful, felonious, deliberate and premeditated killing of a human being with malice aforethought. As used in these instruc-

tions the word *willful* means intentional, not accidental. *Felonious* means wickedly and against the admonition of the law, unlawfully. *Deliberately* means a cool state of blood, it does not mean brooded over, considered, reflected upon for a week, a day or an hour, but it means an intent to kill executed by a party not under the influence of violent passion suddenly aroused by some just or lawful cause of provocation to passion, but in the furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful act. And the passion here referred to is that only which is produced by what the law recognizes as a just or lawful cause of provocation to passion. *Premeditated* means thought of before hand for any length of time, no matter how short the time. *Malice,* as used here, does not mean mere spite or ill-will as generally understood, but signifies an unlawful state of the mind, and such state of the mind as one is in who intentionally does an unlawful act. *Aforethought* means thought of beforehand.

"2. The court instructs the jury that in this case there is no just and lawful cause of provocation to passion.

"3. The court instructs the jury that if you find and believe from the evidence that at the county of Jackson and State of Missouri, at any time before the 25th of July, 1904, defendant, Frank Hottman, either alone or acting in concert with another or others willfully, deliberately, premeditatedly and of his malice aforethought did with a certain club or bludgeon, a certain razor and a certain pair of scissors and that the same or either of them was a dangerous and deadly weapon, beat, bruise, cut and stab one Clarence Myers, inflicting upon him mortal wounds, from which mortal wounds the said Clarence Myers, within one year thereafter at the county of Jackson and the State of Missouri, died, then you will find the defendant guilty of murder in the first degree and so say in your verdict.

In that event you have nothing to do with the punishment; that is fixed by law.

"4.  If verbal or written statements of the defendant have been proven in this case, you may take them into consideration, with all the other facts and circumstances proven.  What the proof may show you, if anything, that the defendant has said against himself, is presumed to be true, because against himself; but any thing you may believe from the evidence the defendant said in his own behalf, you are not obliged to believe, but you may treat the same as true or false, just as you believe it true or false, when considered with a view to all the other facts and circumstances in the case.

"5.  The court instructs the jury that when two or more persons act together in the commission of an unlawful act or purpose, what either does in carrying out such unlawful act or purpose is, in law, the act of each of said persons.

"6.  Flight raises the presumption of guilt, and, if the jury believe and find from the evidence that, after the commission of the offense alleged in the information, the defendant fled from the State, and tried to avoid arrest and trial for said offense, then the jury may take this fact into consideration in determining his guilt or innocence.

"7.  The court instructs the jury that the law presumes the innocence and not the guilt of the defendant, and this presumption of innocence attends the defend-. ant throughout the trial, and at the end entitles the defendant to an acquittal, unless the evidence in the case, when taken as a whole, satisfies you of defendant's guilt beyond a reasonable doubt, as defined in these instructions.

"8.  The court instructs the jury that before they can convict the defendant they must be satisfied of his guilt beyond a reasonable doubt; such doubt, to authorize an acquittal upon reasonable doubt, must be a substantial doubt of the defendant's guilt, with a view to

all the evidence in the case, and not a mere possibility of the defendant's innocence.

"9. The jury are the sole judges of the credibility of the witnesses and of the weight and value to be given to their testimony. In determining as to the credit you will give to the witness, and the weight and value you will attach to a witness's testimony, you should take into consideration the conduct and appearance of the witness upon the stand, the interest of the witness, if any, in the result of the trial, the motives actuating the witness in testifying, and witness's relation to or feelings for or against the defendant, or the alleged injured party, the probability or improbability of the witness's statements, the opportunity the witness had to observe and to be informed as to matters respecting which such witness gives testimony, and the inclination of the witness to speak truthfully or otherwise as to matters within the knowledge of such witness. All these matters being taken into account, with all the other facts and circumstances given in evidence, it is your province to give to each witness such credit and the testimony of each witness such value and weight as you deem proper."

The motion for new trial contained the usual grounds that the court erred in admitting and rejecting evidence; that the verdict was against the law and the evidence; that the court erred in instructing the jury, and specially that "the court erred in refusing to quash the entire panel of the jury in view of the fact that the confession used in evidence was printed in the Kansas City Times and had been read by the jury on the morning of January 11, 1905," and in permitting one of the jurors to be separated from the regular panel and in its interrogation of the entire panel and to each juror. The motion in arrest is practically the same as the motion for new trial except that it also challenges the information as insufficient. The defendant is not represented by counsel in this court, either orally or by brief,

but the charge is so grave and the consequences so direful, that we have as in duty bound carefully examined the record and will consider the various points made in the motion for new trial and in arrest of judgment.

I. The information was sufficient both in form and substance. It was competent to charge the murder to have been committed by the use of more than one weapon. [State v. Blan, 69 Mo. l. c. 319; State v. McDonald, 67 Mo. 13; State v. Thomas, 99 Mo. 235; State v. Myers, 94 S. W. 242.]

The information charges the weapons to have been deadly weapons but it was not necessary to do so. [State v. McDaniel, 94 Mo. 301; State v. Bowles, 146 Mo. 6.]

II. As to the ground of the motion for new trial that the court erred in not quashing the entire panel of forty-seven jurors, the record exhibits these facts: On the 9th of January, 1905, a panel of forty-seven jurors was selected to try this cause, none of whom were challenged by defendant. The defendant took the twenty-four hours allowed by statute to make his peremptory challenges and accordingly further proceedings were postponed until January 11, 1905. When the court convened on the 11th, the jurors appeared, and the defendant by his counsel made the following statement and challenge orally: "Counsel for defendant objects to the entire panel of this jury, the forty-seven to try this case of the State against Frank Hottman; it has been given out to the newspapers, newspaper reporters, and on the 11th day of January, the day set for trial, there appeared in the newspaper of Kansas City, a full confession purported to be that of Frank Hottman; that each and every juror had a fixed opinion during the time he was asked and he has since read the confession that is purported to be that of Frank Hottman."

"The Court: The motion is to quash the panel?

"Mr. Urfer: Yes, sir, that is my motion.

"The Court: What do you propose to do now?

"Mr. Urfer: I think we ought to have a different panel, that haven't got an opinion.

"The Court: What do you offer in support of your motion?

"Mr. Urfer: I can offer the affidavits from a number of people that this jury is biased, I can support it with my own affidavit.

"The Court: Go find out what you want to do.

"Mr. Urfer: I offer as an exhibit the Kansas City Times publication of January 11, 1905, what purports to be a confession of Frank Hottman.

"Mr. Kimbrell: The State objects to the paper as incompetent and irrelevant to sustain the charges made by counsel for defendant."

At this point the court of its own motion examined each member of the panel of forty-seven jurors as to whether or not he had read the purported confession of the defendant in the Kansas City Times of that morning. Most of the panel had not seen or read the article, but jurors Kelley, Jones, Bryant and Souter had, and said that they had formed an opinion from reading it. Thereupon the court overruled the challenge to the array as a whole, but sustained it as to the four jurors named and discharged them from the panel of forty-seven and proceeded to draw fifteen other names from which to fill up the panel and from the fifteen, four other jurors were selected to take the place of those discharged. And no challenge to any of them was made for cause.

The motion of defendant's counsel to set aside the whole panel was a challenge to the array and was made *ore tenus.* In State v. Taylor, 134 Mo. l. c. 143, it was said: "It is the established rule at common law that a challenge to the array must be in writting, and this is the case also where the common law has not been abrogated by statute. [1 Chit. Crim. Law, 546; 2 Tidd's Prac., 851; People v. McKay, 18 Johns. 218;

State v. Clark, 121 Mo. 513; Ryder v. People, 38 Mich. 269.]'' But independently of the form of the challenge, the defendant did not sustain his motion to discharge the whole panel. Unquestionably he had the right to re-examine the jurors on the morning of the 11th of January, 1905, for the purpose of ascertaining whether anything had occurred to disqualify them since their selection on the 9th of January. This he did not do, but contented himself with offering in evidence the copy of the Times published that morning, containing a purported confession of the defendant, and made no request to examine the individual jurors as to whether they had read or seen the same. Obviously, those who had been tried and found indifferent between the State and defendant, and who had not read the purported confession, were not rendered disqualified merely because the newspaper contained the alleged confession. The learned criminal court, however, proceeded of its own motion to ascertain how far the panel had been affected by the publication and ascertained that only four of the jury had read the purported confession and had been affected by it, and then and there excluded them from the panel and proceeded under the statute to supply their places by other disinterested jurors, to whom no objection was taken and saved. It seems to us the court took the only wise and just course in the premises. In State v. Collins, 86 Mo. l. c. 248, this court said: ''It is insisted that the action of the court was erroneous in procuring a panel of forty qualified jurors on the sixth of March, when the cause could not be tried until the tenth of March, inasmuch as the jurors who might have been qualified on the 6th, might have become disqualified between the sixth and the tenth of March. We are of opinion that this point is not well taken, inasmuch as when said jurors appeared on the tenth, defendant or his counsel, if they had so desired, could have examined them to ascertain the fact whether they, or any of

them, had become disqualified by anything done or said between the said two dates.''

In Eberhart v. State, 47 Ga. 598, the defendant filed a motion to quash the panel sworn to try the defendant upon the ground that the name of one of the jurors was not in the jury box and that other jurors had been put upon him whose names were not in the box. Passing upon that question, the Supreme Court said: ''A motion to set aside the panel is, in substance, a challenge to the array, and must be on some ground that *taints the whole*. The facts claimed to be true here have only reference to *some* of the jurors, and we are unable to understand how it can be contended they affect the array. If the men on the panel who come within the category stated are taken off the list, there would be no objection to it. The facts no more make a ground of challenge to the panel than would the fact that there was on it a juryman disqualified from interest, bias or kinship.'' We think the court properly refused to quash the whole panel in the circumstances and pursued the only wise and proper course and its action furnishes no ground for reversal. The court and the parties were placed in the awkward situation by no fault of theirs, but by the pernicious and unwarrantable action of the proprietors of the newspaper. The publication of a part of the material testimony against the defendant in advance of its admission by the court was well calculated to impede and interfere with the administration of justice and to delay the trial at great cost and inconvenience to the State, the court and the parties. It is at least questionable whether it was not a contempt of the court. It is intolerable that the courts should be embarrassed and that the rights of parties in grave judicial matters should be affected by publications like this. Every citizen has a right to have his rights adjudicated and passed upon by the courts and juries unaffected by outside interference in any manner whatever. Fortunately in this case only four of the panel were disquali-

fied, and the court properly excluded them from the jury, but it can readily be seen that the whole panel might have been likewise disqualified and a most serious and grave prosecution delayed at great cost and inconvenience, by the ill-advised publication.

III. The tenth ground of the motion for new trial assailed the form and substance of the questions propounded by the court to the panel as a whole and to the individual members thereof, on their *voir dire* examination. We discover no objection in the record to the court's manner of interrogating the panel or any juror. It is now axiomatic that if a party desires this court to review any matter of exception on the trial, he must make his objection and save his exceptions at the time it occurs and then repeat it in his motion for new trial. As this was not done in this case, there is nothing before us for review on this point.

IV. In the absence of any brief or argument pointing out any supposed error of the criminal court in admitting testimony on behalf of the State, we have been compelled to examine the record for ourselves. By far the most important pieces of evidence introduced in the case were the two confessions or statements made by the defendant at Walla Walla, Washington, and at the Midland hotel in Kansas City, respectively. To the admission of these we find counsel for defendant objected, after a preliminary examination of Mr. Oldham, who testified he was present when the one made at Walla Walla was written, and of Captain Whitsett, who wrote down the one made at the Midland hotel. Both of these witnesses testified fully as to all the circumstances attending the making of these statements. They stated that the defendant not only was not offered any clemency but no threats were made to induce him to make the said statements. On the contrary, he seemed anxious to tell his connection with the murder. The trial court pursued the approved practice of inquiring

fully into the circumstances under which the confessions were made in order to ascertain whether or not they were voluntary. No attempt was made to contradict the statements made by the witnesses for the State that they were voluntary. No improper influences appear to have been used by the officers to obtain the same. Prima facie the confessions were admissible, and in the absence of any improper conduct upon the part of the officers to induce the same by the flattery of hope or promise of immunity or the use of any threats, we must hold the confessions were properly admitted. We have been unable to find any other evidence to which any serious objection was made, or that was tenable, and consequently it must be held that this ground for new trial was not sustained. [State v. Jones, 171 Mo. 401; State v. Hopkirk, 84 Mo. 284; State v. Stebbins, 188 Mo. 396.]

V. The court's instructions properly confined the jury to the issue of whether the defendant was guilty of murder in the first degree or not guilty of that offense. There was no evidence justifying any instruction for murder in the second degree. The instructions were such as have often met the approval of this court and left nothing to be desired. There was no evidence of any provocation either just or lawful, and it was proper for the court to so tell the jury. Finally, the evidence *aliunde* fully corroborated the confession of the defendant and pointed unerringly to the defendant as one of the guilty participants in the murder of Clarence Myers, who was asleep in his home when the defendant and the wife of Clarence Myers, in pursuance of a guilty conspiracy, assaulted their sleeping victim. The record discloses not only murder, but a sickening disclosure of marital infidelity by a wife to an unsuspecting and generous husband, which would be almost incredible were the evidence not so conclusive and unshaken.

After a careful review of the whole record, we are

prepared to say the defendant had a fair and impartial trial and that the verdict of the jury was and is amply sustained by the testimony.

It follows that the judgment and sentence of the criminal court of Jackson county must be and is affirmed, and the sentence which the law pronounces is directed to be executed.

*Burgess, P. J.,* and *Fox, J.,* concur.