THE STATE v. TURNER WILSON, Appellant.

Division Two, May 9, 1912.

1. HOMICIDE: Self-Defense: Withdrawal from Combat: Evidence: Question for Jury. In this prosecution for murder, where there was substantial evidence tending to show that defendant struck deceased with a rock and then ran, that deceased followed the defendant and attacked him, and that the defendant then shot and killed deceased, the good faith of the defendant in withdrawing and the consequent revival of his right of self-defense became a question for the jury.

2. MANSLAUGHTER: Second Degree: Instruction. When there was substantial evidence tending to show that defendant struck deceased with a rock and ran; that the deceased pursued the defendant through a crowd and into a crowded street; that he held in his hand a piece of brick or stone; that he

242 Sup.—31.

overtook the defendant, who had fled until checked by some stands and the crowd; that he seized the defendant by the shoulder or around the neck and struck at defendant's head with the weapon he carried; that by reason of the fact that the defendant "ducked" toward deceased the latter's arm or wrist struck the defendant and the brick fell from his hand; and that it was after deceased had thus accidentally disarmed himself the fatal shots were fired—when there was such evidence the trial court should have instructed on manslaughter in the second degree as defined by Sec. 4461, R. S. 1909, which reads: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or do any other unlawful act after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree."

3. **MANSLAUGHTER: Provocation: Previous Malice: Question for Jury: Instructions.** An instruction on manslaughter in the fourth degree should be given when there is substantial evidence of provocation, despite the fact that there is evidence that the defendant had previously threatened the deceased and the further fact that the killing was done with a *deadly weapon.* In such case the existence of previous malice or a deliberate purpose to kill, such as would cause the provocation to be disregarded, must be ascertained by the jury, not by the court.

4. **INSTRUCTIONS: On All Theories Supported by Substantial Evidence.** Courts cannot confine their instructions to those theories in support of which the evidence preponderates. It is their duty to instruct upon every theory supported by substantial evidence.

## Appeal from Daviess Circuit Court.—*Hon. A. B. Davis*, Judge.

REVERSED AND REMANDED.

*A. G. Knight* and *Dudley & Selby* for appellant.

(1) Where a defendant withdraws from a conflict in good faith, begun by him, intending to abandon it, his right of self-defense will revive notwithstanding he may have begun the conflict with a felonious, or

even a murderous, intent. And where, after such withdrawal, in a subsequent encounter between deceased and defendant, deceased inflicts blows upon defendant, such blow or an assault of any kind upon the person, furnishes the lawful provocation, which in every instance reduces the homicide to manslaughter. State v. Heath, 221 Mo. 588; State v. Cable, 117 Mo. 380; State v. Lockett, 168 Mo. 489; State v. Partlow, 90 Mo. 608; State v. Weekly, 178 Mo. 413; State v. Wensell, 98 Mo. 137. It is a question for the jury to decide, whether the defendant withdrew in good faith from the conflict, and likewise a question for their decision, whether there was lawful provocation, sufficient to excite a passion to reduce the homicide to manslaughter, and the testimony of the defendant alone furnishes a basis for an instruction on manslaughter in the fourth degree, and its refusal would constitute error. State v. Heath, 221 Mo. 588; State v. Darling, 199 Mo. 169; State v. Sebastian, 215 Mo. 80; State v. Banks, 73 Mo. 592; State v. Wensell, 98 Mo. 137. The provocation necessary to arouse the heat of passion which would result in reducing the crime to manslaughter may be an assault, or any sort of personal violence. A provocation consisting of personal violence is sufficient. State v. Heath, 221 Mo. 588; 1 East's Pleas of the Crown, 233; 4 Blackstone's Com., 201; State v. Wieners, 66 Mo. 13; State v. Starr, 38 Mo. 271; State v. Branstetter, 65 Mo. 149; State v. Hill, 69 Mo. 451; State v. Elliott, 98 Mo. 150; State v. Gartrell, 171 Mo. 516; State v. Sebastian, 215 Mo. 58.

*Elliott W. Major*, Attorney-General, and *Campbell Cummings*, Assistant Attorney-General, for the State.

(1) Was it error for the court to fail to give an instruction for manslaughter in the fourth degree under section 4468, Revised Statutes 1909? According to appellant's evidence, while he was standing at the

corner at the telephone pole, deceased came along and gave him a shove, which was coupled with insulting words; that thereupon, all the wrongs deceased had done him in regard to the former's relations with the latter's wife, flashed in his mind, and he looked for the deceased, and, on discerning him in front of the "keg game," where he was standing watching it, appellant stooped and picked up two half bricks, or rocks, he doesn't know which, started to throw one at appellant, and his arm being caught or knocked, he threw the other and hit deceased in the back of the head. He had testified on cross-examination that he had his mind made up before that time to shoot deceased if he caused him any trouble that day. He further testified that deceased stooped and picked up, presumably the brick, or rock, with which he was hit, and started for him; that "It seemed like something came over him, he wanted to get away from there;" that he ran to the east side of the street and stopped "as it was about as far as it seemed he could go;" that he could have crowded through, but he didn't want to run over anybody to do it;" that the deceased, on coming up to him, took hold of him with one hand and struck at him with the other, the blow falling upon his shoulder; that that part of the deceased's arm between the elbow and the wrist fell upon his shoulder, and, as it struck his shoulder, something that had been in deceased's hand fell to the ground; that thereafter he pulled his gun and shot. Manslaughter in the fourth degree has been defined, under the above statute, by our courts. 21 Cyc. 736, 737; State v. O'Hara, 92 Mo. 59; State v. Jones, 79 Mo. 441; State v. Ellis, 74 Mo. 207; State v. Holme, 54 Mo. 143; State v. Gassert, 4 Mo. App. 44; State v. Sharp, 233 Mo. 269; State v. McKenzie, 228 Mo. 385; State v. Sebastian, 215 Mo. 58; State v. Darling, 199 Mo. 168; State v. Todd, 194 Mo. 377; State v. Weakly, 178 Mo. 413; State v. McKenzie, 177 Mo. 699; State v. Gartrell, 171 Mo. 489; State v. Reed, 154

Mo. 122; State v. Meadows, 156 Mo. 110; State v. Heath, 237 Mo. 255; State v. Gordon, 191 Mo. 114; State v. Ashcraft, 170 Mo. 409; State v. Diller, 170 Mo. 1; State v. Sumpter, 153 Mo. 436; State v. Garrison, 147 Mo. 548; State v. Kindred, 148 Mo. 270; State v. Bowles, 146 Mo. 6; State v. Rose, 142 Mo. 418; State v. Reed, 137 Mo. 125; State v. Hermann, 117 Mo. 637; State v. Bulling, 105 Mo. 204; State v. Brown, 64 Mo. 367; 21 Cyc. 737, 738; State v. Bates, 239 Mo. 507; Stephenson v. U. S., 162 U. S. 320. The sufficiency of the provocation to excuse or extenuate murder is generally a question of law. 21 Cyc. 1028; State v. Heath, 221 Mo. 565; State v. Howard, 102 Mo. 142; State v. Elkins, 101 Mo. 344; State v. Berkley, 92 Mo. 41; State v. Partlow, 90 Mo. 608; State v. Ellis, 74 Mo. 207; State v. Packwood, 26 Mo. 340; State v. Jones, 20 Mo. 58; State v. Dunn, 18 Mo. 419. Whether such provocation or heat of passion existed in the particular case is one of fact. 21 Cyc. 1028; State v. Hanson, 231 Mo. 14; State v. Heath, 221 Mo. 565; State v. Ellis, 74 Mo. 207. The Cyc. lays down as a better rule that the question of reasonable cooling time is for the jury. 21 Cyc. 1028; 1 Wharton's Crim. Law (10 Ed.), sec. 480; 2 Bishop's New Cr. Law (8 Ed.), secs. 711, 712; State v. Wood, 97 Mo. 31. Under our cases the words "legal," "lawful," "adequate" and "reasonable provocation" are synonomous. State v. McKenzie, 177 Mo. 699; State v. Berkley, 109 Mo. 667; State v. Bulling, 105 Mo. 204. Whether or not the brick or rock used was a deadly weapon is shown by the kind and effect of the wound inflicted with it, which showed an intention to do serious bodily harm. State v. Bowles, 146 Mo. 6. Some of our cases seem to recognize an excited state of mind produced by some lawful provocation, such as a blow, or an assault of any kind upon the person. State v. Todd, 194 Mo. 377; State v. McKenzie, 177 Mo. 699; State v. Pollard, 139 Mo. 220; State v. Ellis, 74 Mo. 207; State v. Branstetter, 65 Mo.

149; State v. Starr, 38 Mo. 277. In one case, at least, the court has recognized the heat of passion, engendered by the wrongful removal of defendant's fence. State v. Mathews, 148 Mo. 185. On the other hand, our court has held in a number of cases, that the lawful provocation must consist of some personal violence, and unless it amounts to personal violence or injury to the defendant, it cannot avail. State v. Gartrell, 171 Mo. 489; State v. Sumpter, 153 Mo. 436; State v. Goddard, 162 Mo. 198; State v. Meadow, 156 Mo. 110; State v. Smith, 114 Mo. 407; State v. McKenzie, 228 Mo. 385; State v. Sneed, 91 Mo. 552; State v. Barrett, 240 Mo. 161; State v. Reed, 154 Mo. 122; 21 Cyc. 741, 743, 746-49; State v. Kloss, 117 Mo. 591; State v. Baker, 146 Mo. 591; State v. Lewis, 118 Mo. 79; State v. Wilson, 98 Mo. 440; State v. Davidson, 95 Mo. 155; State v. Partlow, 90 Mo. 608; State v. Gilmore, 95 Mo. 554; State v. Dunn, 80 Mo. 681; State v. Snell, 78 Mo. 240; State v. Christian, 66 Mo. 138; Strong v. State, 85 Ark. 536; Armsworthy v. State, 49 Tex. Cr. 622. (2) Where malice was harbored by the accused against the deceased, and a trivial provocation was received by the accused, such provocation is to be disregarded unless it is shown that the murderous purpose was abandoned before the homicidal act was committed; the presumption in such case being that the killing was induced by the malice and not by the passion produced by the provocation. State v. Dettmer, 124 Mo. 426. We submit that there is no evidence of a withdrawal by appellant. State v. Heath, 237 Mo. 255; 1 Wharton's Crim. Law, sec. 486; McClain's Crim. Law, sec. 310.

BLAIR, C.—Having been convicted in the circuit court of Daviess county of murder in the second degree and sentenced to twenty-five years in the penitentiary defendant appealed.

The deceased, Alonzo Dugger, and the defendant, Turner Wilson, had lived some years in the town of Coffey, Daviess county, but about a year prior to the killing defendant had moved away, and in May, 1910, took up his residence in Gilman City, some six or seven miles from Coffey. On August 16 and 17, 1910, a picnic or street fair was in progress in Coffey and both defendant and deceased were in attendance. It appeared from the testimony that bad blood had existed between the two by reason of defendant's belief (apparently well grounded) that illicit relations existed between deceased and defendant's wife. The evidence tended to show that defendant had made threats of violence against deceased, some remote and some more recent. On the day of the tragedy there was a large crowd in Coffey. Near the intersection of the two principal streets the usual stands had been erected close to the sidewalks leading from the crossing and south of the intersection mentioned, and on the west side of the street running north and south, close to the sidewalk, was a lemonade stand, and south of it there was what is designated as a keg stand, a passageway between the two leading from the sidewalk eastward into the street. Across on the east side of the street were several other stands, among which was one referred to by the witnesses as the peanut stand. It was small and stood opposite the keg stand. Other stands were north and south of it respectively. About these stands and others and in the street between, on August 17th, crowds were collected, making purchases, indulging in various amusements or engaged in conversation. About two p. m. deceased was standing near the west side of the keg stand and about ten feet south of its northwest corner when defendant, who had been observed a few moments before at the southwest corner of the street intersection standing beside a telephone pole at that point where he picked up something, was seen to have advanced to a point about eight feet from

deceased at whom he attempted to throw a piece of brick. A bystander struck defendant's hand or arm and the brick fell to the ground but defendant immediately took another like object from his left hand and this time threw and struck deceased, whose back was partially turned and who was apparently oblivious of what was transpiring. The missile made a wound near the base of deceased's skull concerning the seriousness of which the physicians disagreed somewhat, but it is clear from their testimony that it was not regarded as a fatal wound. Deceased was not knocked down by this blow but it caused him, to use the language of some of the witnesses, to "stoop" or "duck" forward, and there is some evidence he was heard to groan. He immediately recovered himself, turned and saw and started for defendant, who thereupon ran eastward between the lemonade and keg stands and thence into the street, pursued by deceased. The witnesses all agree that when deceased turned, after being struck as stated, and started running up the sidewalk after defendant, the latter turned and ran from him into the street. There are some discrepancies as to the rate of speed at which pursued and pursuer proceeded and some differences of opinion as to what effect the blow deceased had received seemed to have upon his powers of locomotion, as well as to whether defendant stopped before deceasd overtook him and at what point defendant first attempted to draw his pistol.

James Wright testified that he saw defendant "run out into the middle of the street like, and Mr. Dugger after him, and Wilson (defendant) kind of stopped and Mr. Dugger caught up with him and they clinched and in just a second or two" he heard a shot; that deceased then broke loose from defendant "and raised right up this way (illustrating) and threw his hands right up this way and kind of crow-hopped back from him just this way" and defendant fired a second shot. On cross-examination this witness stated that the first

he saw of defendant he was running into the street with deceased in pursuit, that deceased caught up with him and they grappled and began struggling, turning around; that he did not see deceased strike defendant or try to do so.  He further stated (and there is no dispute on the point) that deceased was larger than defendant and could have borne him down with his weight but witness did not see him attempt to do so. This witness was about sixty feet distant from the point where the first shot was fired and testified that there .was a crowd around the men which prevented him from seeing all that happened.

James Stith testified that deceased, after being struck by the missile thrown by defendant, "pulled his hat over his head and struck up the walk after" defendant who ran out between the stands into the street and witness stepped aside to let deceased, who was pursuing defendant, pass through after him.  As defendant ran he looked back and when he saw deceased coming he put his hand in his pocket and went on and deceased "ran up to him and threw his arm over him that way (indicating) and Wilson looked as though he ducked down like that, and when he did that" witness heard the report of the revolver but couldn't see the men.  Deceased then straightened up and witness saw defendant fire a second shot.  Deceased when he caught up with defendant, tried to catch him or "made a kind of lick or swipe at him" and defendant "ducked to escape that lick" and put his hand against deceased and tried to push him away.  Witness said they were "right together" and there was "rather a struggle, when he threw his hand around that way" and they "swung around a little bit in the struggle" until defendant was "more on the north than he was right at the time he (deceased) caught up with him." This witness also testified that defendant had got across close to the little peanut stand just as deceased caught him

and was, as the witness recollected it, going along backward at that moment.

F. M. Miller, who was within two or three feet of deceased and defendant when the first shot was fired, testified that he was standing near the peanut stand and heard a sound as of some hard object striking a board and then saw defendant come out into the street "in a kind of a trot like," with deceased in pursuit; when defendant reached the stands across the street he looked around and checked up as deceased caught up with him.

Cross-examination: "Q. Dugger outran him and caught him? A. He (defendant) kind of stopped when he came to those stands. Q. He ran up into the stand? A. Not right up to them but near them. Q. Which hand did he catch him with? A. Of course, you spoke —he throwed his right hand or left hand over his shoulder. Q. Around his neck? A. It just went kind of raised over his shoulder, down just that way. Q. Show it on me? A. He kind of ran up this way and fell against him and struck over him like that (illustrating on counsel). Q. Struck at him twice? A. He didn't hit him, he struck over him. Q. He didn't hit him because he struck over him? A. Yes. Q. You saw the licks, one, two? A. Yes. Q. Striking over Mr. Wilson? A. Yes, sir. Q. And as you have described it, leaning on him? A. Yes, sir. Q. And Wilson was stooped down somewhat? A. A little bit. Q. Any? A. He kind of hunkered down a little. Q. And this man was bent over him, striking him? A. Yes. Q. And struck the two licks? A. Yes; before he got to him he kind of leaned against him like; he didn't have but just to stoop. Q. He had his weight on him apparently? A. Just enough to stop him, you know. Q. And he struck two licks with his right hand? A. Yes. Q. And at that time how far were you from him? A. About two and a half feet. Q. And you saw what you are describing to the jury and think you are telling it

as it was, as you saw it? A. Yes, sir. Q. As Mr. Dugger was bending over this man, striking at him, he was above him? A. He would be just like I would be by you; he just came over that way. Q. He was as much taller than Wilson as you would be than me—or not; wasn't he? A. No, I don't think he was. Q. How many inches taller was he than Wilson? A. I don't think over four or five inches. Q. You didn't think he was more than that? A. No, I don't know exactly. Q. He was a broad-shouldered man? A. He wasn't so awful broad. Q. Was he as tall as you? A. No, sir. Q. How tall are you? A. Six feet and one inch. Q. Mr. Wilson here was right by that peanut stand when Dugger overtook him and caught up with him and put his arm over his head? A. He wasn't right up against him. Q. How close was he to him? A. He was in probably two feet of him. Q. In two feet of this peanut stand? A. Probably. Q. Mr. Dugger had followed him from that sidewalk clear across the street to where the peanut stand was? A. Yes. Q. In a run? A. They were not running very fast, just kind of trotting. Q. Not running a foot race but they were both running kind of fast, both of them? A. They were both in a hurry, yes. Q. When Mr. Dugger was striking at him, Wilson had his hand in his pocket, you think? A. Yes, sir, he did. Q. And tried to pull his pistol out and it caught in the pocket or something, and he grabbed with the other hand and released it, and shot, one, two, just as quick as he could shoot? A. Yes, sir. Q. And that was when Mr. Dugger was right practically over him? A. They was just separated about eighteen inches. Q. Dugger kind of jerked back from him when he struck these licks? A. When Wilson got his gun out and kind of turned around, they both kind of gave from one another. Q. Where were Dugger's hands at the time Wilson tried to get the pistol out of his pocket? A. He had his hands over his head like in a kind of a little scuffle with him. Q. They

clinched there? A. Wilson didn't clinch nothing. Q. This little man didn't have hold of him? A. No, sir, he didn't have hold of Dugger at all. Q. Dugger was doing all the holding and clinching? A. Yes, as I told you before. Q. When he got the pistol out he shot one, two, as quick as he could? A. Yes."

On recross-examination Miller further testified: "Q. You say that when Dugger left that walk he went after Wilson just as a man trying to catch another? A. It seemed that way. Q. And that's what you have said all the time, isn't it? A. Yes, sir. Q. And of course, after these two licks that you say struck him on the head, but you don't think were sufficient to knock him down or knock his hat off, then it was after that that Mr. Wilson got his pistol out of his pocket, wasn't it? A. He was getting it out all at the same time, about. Q. While these licks were being struck? A. Yes. Q. While this man was hitting him over the neck and head? A. Yes, sir."

Victor Christopher testified that he saw the defendant throw and strike deceased; that the latter "kind of fell over" and stepped back and then defendant got off the walk and ran past the witness into the street; that deceased pursued and caught defendant and a scuffle ensued, whereupon defendant drew a revolver and fired. Witness could not tell whether deceased had anything in his hand because, as he said, "when Dugger had hold of Wilson his back was done turned southeast of me a little bit, and they were scuffling, and kind of weaving backward and forward a little bit there." On cross-examination he testified that when defendant ran into the street deceased pursued and caught him and took hold of him and then he saw defendant draw a pistol and fire. Witness saw no blows, but could not say none were struck. The two were clinched and hence he could not tell whether deceased had anything in his hands.

J. D. Sevier testified that he saw defendant emerge from the crowd on the west side of the street with deceased in pursuit. Defendant stopped in the street "and looked north and south and deceased came up and threw his arms over" and defendant drew his revolver, meeting with some difficulty in doing so, and fired. Deceased had nothing in his hands and witness saw his hands over defendant's "shoulder, kind of over his head, around the top of the crown of his head that way."

On cross-examination witness said that when deceased overtook defendant the latter who had been going eastward in a "sort of trot" or "running walk," stopped and looked north and south "or to see which way he could go" and thereupon deceased "just went up kind of behind him and folded his arms kind of over his head that way." Deceased was behind defendant and his arms were locked around defendant's head and then it was defendant put his hand in his pocket, drew the pistol and fired. Witness said that if deceased struck defendant he did not see it.

W. S. Underwood testified that as defendant ran into the street he had his hand in his pocket. He checked up in the street, and deceased, who had caught up, "started to put his arm around him, and laid it on his shoulder about midway between his elbow and wrist" and then the first shot was fired. Witness saw no blows and no struggle.

Russell Stewart said that defendant ran, after throwing the missile which struck deceased, and as he passed the witness, who was standing in the street fourteen to sixteen feet from the sidewalk and east of it, he (defendant) saw that deceased was running after him and then he put his hand in his pocket. Defendant ran on east several feet, attempting to draw his pistol in the meantime, and then stopped and deceased, who had come up at once, threw his arms around defendant, and defendant fired.

M. O. Glaze testified that he saw deceased following defendant out into the street; that deceased went on beyond defendant and to a position north of him and then as they were facing each other the first shot was fired. This witness was standing some twenty-five or thirty feet south and east of the passway between the keg and lemonade stands. He thought deceased was in front of defendant as they ran into the street and saw no blows, clinching or struggle. The discrepancies between his testimony and that of all the other witnesses are doubtless due to the highly nervous state he was in as the result of a protracted illness from which he was just recovering and which had greatly affected him, as he testified.

The evidence for the State further tended to show that the first shot pierced the stomach and that a second shot, fired immediately "as quick as a man could shoot," struck the collar bone and ranged downward through the upper part of the lung. At the next effort to fire the cartridge did not explode and then deceased moved away and as he reached the street crossing a third ball struck him in the calf of the leg. Defendant followed, fired a fourth but ineffectual shot and was then seized and disarmed after a struggle in which, to sum it up, he acted like a wild man. There was also evidence tending to show that the blow upon the head with the piece of brick thrown by defendant dazed deceased so that he ran unsteadily when pursuing defendant. The wounds inflicted by the first two shots fired were both of fatal character and from their effects death followed in a few hours.

Such is the character of the evidence for the State.

On the part of the defense there was evidence tending to show that defendant and deceased had both lived in Coffey during the six, or seven years prior to the summer of 1909; that defendant found two letters written by deceased to defendant's wife. The discovery of the first of these in the summer of

1909 brought about a confession by the wife of the existence of illicit relations between her and deceased. Deceased's son-in-law began negotiations with defendant for possession of this first letter and did secure possession of it, paying defendant a hundred dollars therefor. The letter was then burned. Defendant testified that his wife threatened to leave him unless he agreed to dispose of the letter to deceased's son-in-law and that he did so because of her threat and gave her the money received therefor. Defendant declared he demanded of deceased that he keep away from his residence and deceased agreed to do so but he discovered him about the premises several times at night and found a second letter from deceased, intended for defendant's wife, in which a meeting was planned. The alleged misconduct of deceased and defendant's wife resulted in the removal of defendant and his family to St. Joseph and the final disintegration of the family establishment. Defendant in May, 1910, went to Gilman, a few miles from Coffey, and began the erection of a home to which he expected to remove, but after he had partially carried out his plans his wife (at deceased's solicitation, defendant testified) refused to live with him any longer. There was evidence that defendant's domestic troubles had wrought much change in him and that his mind had become affected. There was other direct evidence of his insanity and it was shown that his father and mother were both insane for several years preceding their deaths and that a brother and sister of defendant's father also were insane.

With respect to the circumstances at and preceding the time the first two shots were fired, B. F. Stewart testified that when Dugger was struck with the piece of brick thrown by defendant he "bowed forward," partially raised up, stooped again, picked up the missile which had struck him, and then defendant started out between the stands in a trot with deceased

after him.  Deceased was eight or ten feet behind defendant.  At a point a little east of the center of the street defendant stopped and turned facing deceased when the latter "threw his left arm over his (defendant's) shoulder and dropped this missile right beside him or back of him."  Deceased's right arm struck defendant "right across the point of the shoulder" and the brick fell from his closed hand, his left arm and hand being on or around defendant's right shoulder. Witness said deceased struck with the brick but he didn't "think he delivered the blow."

Fred Price saw deceased pick up the piece of brick with which he had been struck and start after defendant, who then jumped off the walk and started east followed by deceased, who, as he approached defendant, changed the weapon he was carrying from his left to his right hand.  As deceased reached defendant he put his arm around his neck and the brick dropped to the ground.

Both these witnesses said that the defendant fired the first shot after deceased took hold of him and that the next shot was fired as deceased was leaning forward toward defendant, about two and one half feet from him.

Defendant testified in his own behalf.  He testified, among other things, that he attended the picnic at Coffey on both the 16th and 17th of August, 1910, and that about two p. m. on the 17th he was standing near the telephone pole near the southwest corner of the little square formed by the intersection of the streets. Presently he saw deceased on the north side of the street.  The latter looked up and down the street and then turned his gaze to the south and espied defendant.  Deceased started across toward the spot where defendant was standing.  Before he reached defendant's position the latter's attention was attracted elsewhere by some noise near him and while his attention was thus engaged deceased ran against him, gave him a

State v. Wilson.

shove, and as he passed on said to defendant, "I reckon you want to pull me for some more." Defendant said that he immediately picked up a brick or rock in each hand and as soon (in a short time) as he located deceased in the crowd he "made a rush" and threw and struck him. The defendant further testified:

"A. He looked around and it looked to me like he was looking down there at the telephone pole at that time, and he dropped his head and seen I was standing there, and he picked up something off of the sidewalk, a rock or something, and he started after me, and it seemed like something came over me and I wanted to go away from there. I got down off the walk and started out in the street and saw he was after me, and I got out in the center of the street and turned around and saw he had something raised up this way, and it looked like he was going to strike me, and I ducked down, and he struck over me, and we scuffled around a little bit. Q. What did you do? A. I looked up and it looked like he was going to strike again, and I got my gun and fired. Q. Why did you fire? A. Because it looked like he was going to hurt me. Q. What did you see in his hand? A. A rock or brick, I couldn't state which. Q. State whether or not he was in the attitude of striking you when you fired? A. That's the way I thought he was then; it looked like he was in the act of striking me at the time."

On cross-examination he testified that he ran from the sidewalk, on the west, across the street to the stands on the east side; that there were several people standing over there and he "looked to see which way he could go and by that time Dugger got there," deceased seized him by the shoulder and struck at his head with the brick or rock; he dodged in toward deceased and the blow missed his head, the brick falling from deceased's hand. He said he was then trying to push deceased away with his right hand; deceased then

pushed down on him with one hand and was attempting to strike him with the other when he (defendant) drew his revolver and fired the first shot. The second shot, according to defendant, was fired as deceased, having loosened his grasp after the first, was returning to the attack. The subsequent happenings defendant said he did not remember.

The above lengthy statement of the facts is made necessary by reason of the character of the questions presented for decision by this voluminous record.

I. Exception was taken to the action of the trial court in refusing to instruct on manslaughter in the second degree. The killing in this case, having been voluntary, was not manslaughter in the second degree unless it comes within the terms of section 4461, Revised Statutes 1909, which reads as follows: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or do any other unlawful act after such attempt shall have failed, shall be deemed guilty of manslaughter in the second degree."

This court has not often had occasion to discuss the scope of this section. In State v. Blunt, 91 Mo. l. c. 508, it was held proper to give an instruction on the offense which it defines in a case in which the evidence tended to show that deceased assailed defendant with a razor, with felonious intent, and was disarmed and slain by defendant with the weapon thus obtained.

The section has been held (State v. Harper, 149 Mo. l. c. 527; State v. Dierberger, 96 Mo. l. c. 676) to have no application to a case in which the attempt to commit the felony or unlawful act had not failed at the time the killing occurred.

These authorities and the language of the statute make it clear that an instruction on manslaughter in the second degree ought to have been given in case there was substantial evidence that the defendant was

unlawfully assailed under such circumstances as to
entitle him to exercise the right of self-defense and
he failed to exercise that right while the peril was im-
pending but after it had passed and the attempt upon
him failed he slew his assailant.   Ordinarily, if the
struggle is continuous and the assault sustained, the
condition of the statute is not met, the attempt has not
failed.   It is also to be observed that the statute is
not applicable to a case in which the failure of the
attempt so long precedes the killing that the latter does
not grow out of the attempt.   In this case the trial
court was right in holding, as it did, that there was
substantial evidence tending to show that if defendant
began the difficulty he had withdrawn therefrom and
his right of self-defense had revived by reason of that
withdrawal.   He was displaying no weapon when de-
ceased started in pursuit of him, and immediately fled,
by means of his flight placing a considerable number
of people between him and deceased.   These circum-
stances and others surrounding the two at the time
certainly tended to show that deceased was no longer in
danger from defendant and that the latter had aban-
doned the conflict.   Under the established rule (State
v. Heath, 237 Mo. l. c. 267 et seq.; Ibid., 221 Mo. l. c. 588
et seq.) the good faith of the defendant in withdraw-
ing and the consequent revival of his right of self-
defense became, in this case, a question for the jury.
Since there was evidence tending to show a withdrawal
and a revival of the right of self-defense it was the
duty of the trial court to take this fact into consider-
ation in passing upon the request for an instruction
on manslaughter in the second degree.   Taking into
consideration the evidence mentioned, the remaining
question for the court to consider in that connection
was whether the evidence tended to show, in addition
to a withdrawal and the revival of defendant's right
of self-defense, an attempt by deceased thereafter to
commit a felony or other crime against defendant, the

failure of such attempt and a killing in consequence of the attempt itself. The trial court held there was no such evidence and the exception saved presents the question here. There was substantial evidence tending to show that deceased pursued defendant through the crowd and into a crowded street; that he had in his hand a piece of brick or a stone; that he overtook defendant, who had fled until checked by the stands and crowd on the east side of the street; that he seized defendant by the shoulder or around the neck and struck at defendant's head with the weapon he carried; that by reason of the fact that defendant "ducked" toward deceased the latter's arm or wrist struck defendant and the brick fell from his hand; and that it was after deceased had thus accidentally disarmed himself the fatal shots were fired.

On the evidence the jury might have found, under the instructions given, that defendant had reasonable cause to apprehend and did apprehend death or great bodily harm at the time deceased seized and struck at him with the brick, but that all danger of either death or great bodily harm ended when deceased's weapon fell from his hand and that the defendant had no reasonable cause to apprehend either death or great bodily harm when he fired, and, consequently, that he did not act in self-defense, as defined by the court. There was substantial evidence to warrant such a finding. We think the instructions should have informed the jury that in case they did so find they must then enquire whether defendant's act was manslaughter in the second degree, properly defining that offense for the jury's information. As indicated above, it has been held, correctly, that section 4461 does not ordinarily apply to a case in which the struggle is a continuous one—for the reason that in such case the attempt *has not failed*. In this respect the facts of this case are peculiar. Some of the evidence tends to show that the situation was radically changed by the first

blow struck and that deceased was disarmed by the
force of the blow he himself delivered. So far as the
assault with the weapon was concerned, there is, there-
fore, evidence tending to show that it had failed, and
though there is evidence that deceased retained his
hold on defendant, there is evidence he did not, and
in either case we think it is obvious that it was for
the jury to determine the question whether deceased
intended a felony or crime and whether the attempt to
commit it had failed when the fatal shot was fired. The
court should have instructed as requested.

II. It is urged the evidence tended to show the
killing was done in the heat of passion, aroused by
adequate provocation, and that consequently the trial
court erred in refusing to instruct on manslaughter in
the fourth degree, as requested. The learned Attor-
ney-General. in his brief, very frankly concedes that
the correctness of the trial court's ruling in this con-
nection is open to serious question. The rule as to
what is manslaughter in the fourth degree, when the
killing is intentional is sometimes formulated thus:
It is the intentional killing of a human being in a heat
of passion on a reasonable provocation, without mal-
ice and without premeditation, and under circum-
stances which will not render the killing justifiable or
excusable homicide. [State v. Sebastian, 215 Mo. l.
c. 80, and cases cited.] As to what constitutes reason-
able provocation, as an abstract proposition, it is un-
necessary, in the circumstances of this case, to inquire.
An assault followed by an actual battery is usually
deemed adequate provocation and that there is sub-
stantial evidence tending to show such an assault after
defendant had withdrawn from the difficulty is ap-
parent from a reading of the testimony of the wit-
nesses. That a conviction for manslaughter in the
fourth degree would have been upheld on this record,
if that question had been fairly submitted, seems cer-

tain. There was evidence of a struggle, a clinch, of blows struck by deceased at defendant with a brick which deceased held in his hand and evidence that the killing did not occur until these things happened. That this would constitute evidence of adequate provocation under ordinary circumstances is not seriously denied but it is suggested that the evidence of previous threats on the part of defendant and the fact that the killing was done with a deadly weapon differentiates this from the ordinary case and may remove the necessity for instructing on manslaughter in the fourth degree. Reference is made to the case of State v. Dettmer, 124 Mo. 426, in which case it was said (l. c. 435): "The testimony lays a broad basis for the existence of *preconceived malice* on defendant's part, aside from the fact of the use of a lethal weapon; and where malice is shown to have been harbored, and a fresh provocation arises to the party cherishing the malice, the provocation is to be disregarded, unless the murderous purpose can be shown to have been abandoned before the act was done; because, where provocation intervenes between expression of malice and killing, the presumption is that the killing was upon the malice, and not upon the passion produced by the provocation. [Kerr's Law of Homicide, sec. 97.]"

In the first place the quotation does not fully state the rule as laid down by Mr. Kerr. He prefaces his statement of it with the remark that "Where the existence of deliberate malice in the slayer is once *ascertained,* its continuance until the act of killing will be presumed, unless such presumption is precluded by subsequent facts and circumstances." Mr. Kerr, by repetition of the phrase, makes it clear that the rule mentioned is applicable only after malice or a deliberate purpose to kill on the part of the prisoner is *ascertained.* By whom is the existence of malice or deliberate purpose to kill to be *ascertained?* Certainly, in a case like this, in which the most that can be said

is that there is evidence thereof, the court cannot ex-
clude the evidence tending to rebut the existence of
malice and tending to show an abandonment of any
purpose to kill or injure which might have been en-
tertained, and having then reached its own conclusion
on the evidence, usurp the function of the jury by de-
termining in their stead the question of fact whether
malice or a purpose to kill ever existed, by this action
withdrawing a large part of the evidence from their
consideration. Before the rule in the Dettmer case is
applicable in this, if applicable at all, the existence of
previous malice or a deliberate purpose to kill must
be *ascertained* and must be *ascertained* by the jury. In
other words, it is a question of fact, and the refusal of
the instruction on manslaughter in the fourth degree
is not defensible on the doctrine of the Dettmer case,
since the approval of the *refusal* of that instruction
on that doctrine amounts to saying that the trial court
was justified in holding that *as a matter of law* there
was previous malice, and also that the killing must be
conclusively presumed to have owned its origin there-
to. On the contrary these questions were questions of
fact. In the Dettmer case an instruction for man-
slaughter in the fourth degree was given. The pre-
vious threats, the character of the weapon used and
all the circumstances of the killing, including the fact
that defendant, after firing twice, followed deceased
firing at him, were for the consideration of the jury
in determining whether the shooting was to be ascribed
to the provocation or to malice. We have not thought
it necessary to discuss the original provocation offered
by deceased when he pushed or shoved defendant and
used the sneering and provoking language attributed
to him by defendant in his testimony. All these things
were facts for the jury to consider. What we hold is
that the jury and not the court was entitled to pass up-
on them, and that, consequently, the refusal to instruct
on manslaughter in the fourth degree was error. [State

v. Heath, 221 Mo. l. c. 581, *et seq.;* State v. Starr, 38 Mo. 277; State v. Barrett, 240 Mo. l. c. 169; State v. Bates, 239 Mo. l. c. 513.] The evidence is conflicting, it is true, but it is the function of the jury to pass upon such conflict and the court is not authorized to assume the truth or untruth of testimony simply because other testimony is to a contrary effect. Courts cannot confine their instructions to those theories in support of which the evidence preponderates. It is their duty to instruct upon every theory supported by substantial evidence.

III. It is also insisted that in the argument before the jury counsel representing the State overstepped proper bounds. Since this case must be retried for other reasons we do not deem it necessary to discuss this assignment at length. We suggest, however, that counsel must keep or be kept within the record or it may be necessary to set aside the verdict obtained. The rule has been often announced and need not be repeated now. It is easy to conform to it and we venture the hope that on the retrial of this case it will be carefuly borne in mind.

For the reasons given the judgment is reversed and the cause remanded. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court. All the judges concur.