THE STATE v. JOHN GADWOOD, Appellant.—116 S. W. (2d) 42.

Division Two, May 3, 1938.*

*NOTE: Opinion filed at September Term, 1937, December 17, 1937, motion for rehearing filed; motion overruled at May Term, 1938, May 3, 1938.

468

*Ira B. McLaughlin, Roy W. Rucker* and *Ralph S. Latshaw* for appellant.

*Roy McKittrick,* Attorney General, *Olliver W. Nolen* and *John W. Hoffman,* Assistant Attorneys General, for respondent.

ELLISON, J.—The appellant was convicted of manslaughter in the Circuit Court of Jackson County and sentenced to imprisonment in the penitentiary for ten years, for shooting and killing Lee Flacey. His brief makes 16 assignments of error. These complain of the overruling of his application for a continuance; of the denial of his counsel's request to inspect a document used by a witness for the State to refresh his memory during direct examination; of the exclusion of evidence in nine instances; of the giving and refusal of instructions; of the failure to instruct the jury on all the law of the case; and of improper argument by counsel for the State. The record and briefs are long and it will be necessary to extend the opinion to unusual length to discuss the points presented.

The homicide occurred on March 27, 1934, during a city election in Kansas City at a restaurant located at 5824 Swope Parkway, two doors from the polling place for the Twenty-fifth Precinct of the Sixteenth Ward in the southeast section of the city. The appellant was the ward leader of one of two rival factions of the so-called "rabbit" Democratic political organization in the city, and the deceased was the captain in that precinct for the other faction. The State's theory was that the appellant entered into a conspiracy to kill the deceased, marshaled a gang of from eight to twelve gunmen and led them to the restaurant about six o'clock in the evening where he participated in the actual shooting and killing of Flacey.

Several persons were present in the restaurant at the time, of whom three testified that the appellant headed the group of men entering the place; that he called for Flacey; and directly or inferentially

that he was armed with a revolver. One of these witnesses, named Shaw, said the appellant advanced with his revolver drawn toward Flacey, who stood there empty handed, and that as he, Shaw, was starting to get out of the room he saw the flash of a gun which looked as if it had been fired by appellant. Another witness, Dorothy Perry, testified the appellant's blue steel revolver was partly drawn from his pocket but that he let it drop back and withdrew his bare hand, about the time the man next behind him fired a gun from the hip. Flacey was behind a partition out of sight but she heard him flounder and groan.

Margaret North said when the appellant entered the restaurant with the others following, and his hand in a position which she indicated but which the record does not show, she covered her head with her coat collar; that the appellant called for Flacey twice, his voice the second time sounding behind her; that out of the corner of her eye she saw the barrel of a blue gun and Flacey's terror stricken face. The witness heard a shot from right behind her. There were two shots fired together, but she said on cross-examination that she didn't see the appellant have or fire a revolver and then repeated on redirect examination that the shots came from behind her (where the appellant was). She kept her head covered for about two minutes until the assailants had left the restaurant and then looked back and saw Flacey falling with his hands up. He had no weapon in sight. We do not find any testimony that more than these two shots, both presumably from pistols, were fired inside the restaurant. There were two bullet holes in the partition separating the restaurant from the rear room. One of them was near the ceiling. The other was not too high for the bullet to have struck the deceased.

The number of men who entered the restaurant was variously estimated by the witnesses. Shaw said there were fifteen or twenty. Dorothy Perry judged there were four and Margaret North thought there were four or five. Witnesses who were on the outside put the number of men who approached the restaurant door at eight to twelve. Some of the witnesses testified there were a number of Italians in the group. Others said they were of mixed nationalities. Many of them were armed.

After the shooting and the departure of his assailants Flacey, who was a deputy sheriff, got up from the floor and hopped on one foot to the front door, saying "They can't get away with that." He drew a revolver from under his left arm and began shooting into the street at the gangsters who were headed for the three automobiles in which they had come. They returned the fire. One witness, Raines, said he saw the appellant pull a black gun from his belt but didn't know whether he fired it. Another witness, Mrs. Emma Craighead, said she saw a man who resembled the appellant, and whom she had heard addressed as "Gadwood" by a third party a few minutes before,

with a gun (pistol) in his hand, and that he shot at Flacey after the latter had fired at him from the restaurant door. One man in, on or behind a car fired several shots with a shotgun. There was a barrage of shots. The door and glass front on the left side of the restaurant were shattered.

A nonparticipant in the affray, a Mr. Oldham, was fatally wounded, one of the gangsters named Cappo was shot by Flacey and later died, and Flacey fell in the restaurant doorway, dead. One witness, Larwood, an eighteen year old boy employed at a neighboring grocery store, was of the opinion that Flacey was killed by missiles from the shotgun since he dropped following the firing of that gun. This witness saw .the appellant running from the restaurant with Harry Gallagher following a few feet behind him. Whether or not the appellant did the fatal shooting, or any of the shooting, he was seen to attempt unsuccessfully to get into the second and then the third of the three cars in which the gangsters were leaving. One of these was a Chrysler sedan. Three men entered it. It backed up quite a distance, struck an obstacle, and turned over. The mortally wounded Cappo was on the back seat of this car and two men, Dryden and Kirby, were in the front seat. Their first names were not stated by the witnesses who gave this testimony, but they were reported to be from Independence. Anticipating a little, we will say the appellant testified he saw Harry Gallagher standing looking at the overturned car.

An autopsy disclosed there were five wounds in the back of the deceased, three between the shoulders, and two just above the pelvis. One of the latter went clear through the abdomen making a wound at about the same level in front. Dr. Leitch, chief deputy coroner, thought the wound in the abdomen was an exit wound because it was larger and irregular in shape. That would mean the bullet hit Flacey in the back and came out in front. If he was hit by any pistol shot it must have made this wound because the missiles that made the four other wounds were found in the corpse and proved to be shotgun slugs. Dr. Leitch expressed the opinion that the abdominal wound was not fatal.

From the foregoing recital it will be seen why the State was unwilling to stand on the sole theory that the appellant, himself, killed Flacey, and sought to establish that he was a conspirator with the gangsters, aiding in the foray. Carrying out the latter theory the State introduced evidence tending to show the appellant recruited the gang. A police officer, C. B. Perry, testified that about four-forty or five o'clock in the afternoon of said election day he was in the appellant's political club room at 4811 Prospect Avenue in the same ward. Mike Davis entered the room with ten or twelve men, four of whom were ''Americans'' and six

or eight Italians. Davis approached the appellant and said "Here's your men."

In about a minute the appellant, Davis, and the gang of men left. The witness did not see them enter three automobiles parked outside, but a minute or two afterward he noticed the cars were gone. One of these was the Chrysler later wrecked at the scene of the homicide, in the opinion of the witness, his identification being made from a photograph. Another witness to the same incident was named Ingles. From a neighboring shop he saw two automobiles drive up to the club room about the same hour. Twelve or fourteen Italians alighted therefrom, went directly into the club room without stopping at the curb, and two or three minutes later came out following the appellant and departed with him in the two automobiles.

T. J. Stubbs saw the appellant late the same afternoon in front of the polling place of another precinct in the ward, at Seventy-second Street and Prospect Avenue. At first he was alone and later he was talking to a group of seven to ten men, some of whom were Italians. The conversation was animated and there seemed to be a difference of opinion between appellant and the others. The witness noticed the butt of a gun (pistol) protruding from the side coat pocket of a little Italian in the group. He was Cappo, the man later shot by Flacey. All the men, including the appellant, left in two automobiles. Several other witnesses testified to seeing the appellant and this group of Italians in apparent conversation at this same place and time; and that one Hymie Ballew was among them. The witness Stubbs gave a written statement to the prosecuting attorney in which it appears by hearsay, that Harry Gallagher was in this group of men, and on redirect examination without objection this fact was elicited from the witness.

The appellant admitted he was with the gang of men in the restaurant when Flacey was shot, but explained it this way. One Hymie Ballew, in company with others, had accused him that morning of cutting the whole Democratic ticket, and he thought he had satisfied Ballew that he was not. That evening about five o'clock from the window of his club room he saw Mike Davis approaching the club room door. (Davis was the man who officer Perry already had testified led the gang into the club room and said "Here's your men.") A group of men intercepted Davis at the curb and he stopped a minute and then came on into the club room with the men following four or five feet behind. There were four of them, among whom was a tall man from the gang he had seen with Ballew that morning. Davis pointed to him (appellant) and said to them "There is the man," and walked on further back into the club room. He was a member of appellant's political faction.

In the room at the time also were Mr. and Mrs. Harry Gallagher,

William Dryden and James Kirby of Independence, and a boy named Keller who had been answering telephone calls at the club that day. Mrs. Gallagher had been driving appellant around to various precincts. Gallagher, who belonged to appellant's faction, had come only a little earlier at appellant's request bringing Dryden and Kirby with him. The appellant just shortly theretofore had received an anonymous threatening telephone message from someone stating they had cars stretched from Swope Parkway to Prospect, and were going to get him, and that there would be no way to get home. He called Gallagher because he wanted him to take Mrs. Gallagher away in view of the threatened danger. The testimony reviewed in the sixth preceding paragraph mentions Gallagher, Dryden and Kirby as having been implicated in the homicide or at least present at the scene thereof. None of them testified.

The appellant testified the four men asked him if he was John Gadwood, and told him they had reports that he was knifing the Democratic ticket and that they had orders to take him out to talk to the aforesaid Hymie Ballew at Seventy-second Street and Prospect Avenue. He asked them if they were the men who had threatened him over the telephone shortly before and they denied it. He consented to go with them, under some pressure, and did go, riding in the gangsters' car. He didn't notice any other car following. He testified he proved to Ballew that he was not cutting the ticket in that precinct, and at Ballew's request continued on to other precincts in the ward with four of Ballew's men in their car to prove to them he was not cutting the ticket. Another car followed them. They stopped at one precinct and then proceeded to where the homicide occurred.

The appellant's captain in that precinct was Ed Manning. Flacey was the captain of the rival faction. When appellant and the four men accompanying him arrived at the polling place he got out of the car with only one of the men following him so far as he noticed. He talked to his precinct captain Ed Manning, but strange to say he made no attempt, so far as this record shows, to prove by him that their faction was not cutting the Democratic ticket. On the contrary he inquired for Flacey, the captain of the rival faction and was informed that Flacey was in the restaurant. Appellant says he went into the restaurant and asked for Flacey, who about that time appeared in the doorway leading to the back room. He said "Hello, Lee," and Flacey said "Hello, John." Appellant asked Flacey if he could see him just a minute and Flacey said "Sure," took three or four long puffs on his cigarette, threw it on the floor and ground it out. At that time the appellant heard "a lot of movement" behind him. Flacey raised his head, looked surprised and pulled out a pistol. A shot was fired from behind appellant that

went right by his ear and he turned and ran out. He swore he had no firearm in his possession at the time and did not fire a shot. He had not talked at any time with the four men who came to the place with him about shooting Flacey or anyone else.

When appellant turned to run he found there were four or five men behind him. He got out of the door first but was unarmed and did not stop or shoot after he got out into the street. Neither did he attempt to get into the car he had come in. He did not see any of the gangsters again that evening. One witness testified that shortly after the shooting she encountered the appellant in Swope Parkway some little distance from the scene thereof. He was holding his ear, and on being asked if he had been shot, he said, "it grazed my ear" and that "Lee Flacey brought a gang out here to get me."

The appellant said he was and always had been on good terms with Flacey. A number of witnesses testified to appellant's good reputation for peace and quiet.

I. The first assignment of error complains of the overruling appellant's application for a continuance filed July 16, 1934, the day the trial started. It will be remembered that officer Berry testified Mike Davis walked into appellant's club room about an hour before the homicide, followed by a gang of ten or twelve men most of them Italians, and said to *appellant*, "Here's your *men.*" (Italics ours.) The appellant admitted that Davis came into the room as stated, but testified that he pointed at him (appellant) and said to the *gangsters "There* is the *man.*" (Italics ours.) From this it will be seen what Davis did say was material and important.

Davis was not a witness at the trial. He had been duly subpoenaed by the appellant on June 21, 1934, nearly a month before the trial date, July 16, 1934, but departed shortly thereafter for Sault Ste. Marie, Michigan. Appellant kept in touch with him and conferred with his counsel and the witness was willing to return and testify when needed. On July 14, two days before the trial, O. H. Stevens, of Kansas City, attorney for and relative of the witness, received a letter from the latter's wife stating there was some question about his ability to return for the trial because of illness and the extreme hot weather in Kansas City and asking to be advised whether the case would be tried on the date set as the witness did not want to attempt to return unless absolutely necessary. On the date of the application and trial, July 16, at the request of appellant's counsel Mr. Stevens called the witness by long distance telephone, but talked to his wife because the witness was too ill to come to the telephone. It was then learned the witness was more seriously ill and could not come to Kansas City; but in the judgment of his physicians would be able to return in sixty days. These

facts were set out in appellant's application for a continuance which was sworn to by one of his attorneys, Ira B. McLaughlin, "as he verily believes." It was also conceded during the argument on the application that the witness, Davis, was under charge of murder in Jackson County, presumably growing out of the same affray, and that his preliminary examination was set for the same week as the trial in the instant case.

As to what the testimony of the witness would be, the application said it was believed he would swear that while returning from his home to his election work in the Ninth Ward late in the afternoon of March 27, 1934, in the vicinity of the appellant's club room he was asked by some strange men where they could find John Gadwood; that he accompanied the men to the club room, pointed out the appellant to them and said "Here's your man." The appellant and these men talked together for a short time out of Davis' hearing. He, Davis, then went on to the Ninth Ward. There was no prearrangement with appellant or anyone else for him to bring the men to appellant, and he did not know them and had not seen them since.

We think there was no error in overruling the application. In the first place it does not show diligence. Appellant's counsel had been in touch with the witness and his counsel, Mr. Stevens, who received a letter from the wife of the witness two days before the trial stating there was some question about his ability to attend, on account of illness. Thus appellant's counsel were put upon notice, or should have been that close to the trial, and while the letter impliedly stated the witness reluctantly would attempt to return to Kansas City if absolutely necessary, yet it was the duty of appellant's counsel to reduce the matter to a certainty so far as possible and to prepare themselves to produce the best evidence of the fact if the witness could not return, without waiting until the very morning of the trial.

The application does not present the best evidence of the facts alleged. It is based on the affidavit of one of appellant's attorney's made on belief, which affidavit depends on hearsay information from Mr. Stevens; the latter's information rests on the hearsay statements of Mrs. Davis, wife of the witness; and her information in turn must have been in large measure hearsay from the husband and his physicians. No affidavit from the witness's physician was produced; no affidavit from Mr. Stevens was produced; and the letter from Mrs. Davis to Mr. Stevens was not produced. During the course of the argument on the application the trial court pointed out that the application was based on hearsay and inquired, "why isn't somebody here who knows about these facts, that wrote the affidavit?" Counsel for appellant answered, "Well, the affidavit will have to speak for itself."

As this court said in State v. Dettmer, 124 Mo. 426, 432, 27 S. W. 1117, 1118, "An application for a continuance must not only be *formally sufficient,* but one of its essential elements, its prominent feature, must be an *evident good faith."* Again it is said such applications must be drawn more carefully than a pleading, and that they receive no favorable intendments. [State v. Good, 132 Mo. 114, 127, 33 S. W. 790, 794.] There are some loose provisions in the statute, Section 3654, Revised Statutes 1929 (Mo. Stat. Ann., p. 3210). It requires an application for a continuance to be supported by the oath or affidavit of the defendant or some reputable person in his behalf, but permits the affiant to state what facts "he believes" the witness will prove, and that "he believes" them to be true. We do not understand, however, that the affiant may support the required statutory recitals, other than as expressly provided, by an oath on information and belief when the facts can be definitely stated or better verification is obtainable. Thus in State v. Worden, 331 Mo. 566, 569, et seq., 56 S. W. (2d) 595, 596, where a defendant's application for continuance alleged that prejudicial and inflammatory remarks had been made in another case by the judge of the court and also by a prominent attorney and others, in the hearing of the jury panel which was to try him, this court said:

"But the statements in such a motion for continuance do not prove themselves. It is true that the motion was verified by the defendant himself but it is not stated that he was present and heard (the statements made) . . . in the presence of members of the jury. It is quite apparent that he was not present at any of those times because he was in jail and his own case did not come up until afterwards. Even if his unsupported verification could be taken as proof of such facts if made of his own knowledge, which we do not decide, the fact that it was not upon his own knowledge but upon information leaves an entire absence of proof. (Parenthesis ours.)

"Further it is quite apparent that the facts alleged, if true, were susceptible of definite proof. If any of those things occurred as alleged, many persons were present and heard them, and affidavits could have been obtained as to whether they occurred and whether any of the jury panel heard any of them. So the allegations of both motions rest entirely without proof when proof was amply available if they were true."

Again, the record shows the substantial facts which the witness would have sworn to could have been proven by other witnesses within the jurisdiction. The appellant's testimony at the trial was that he had received an anonymous threatening telephone call late in the afternoon. He summoned his friend Harry Gallagher because he wanted him to take Mrs. Gallagher away in view of the impending danger. Gallagher came in response to the summons, bring-

ing Dryden and Kirby. The telephone boy Keller also was there. Within ten minutes or so a group of four strange men came walking into the room behind Mike Davis. One of the four had been with Hymie Ballew when the latter that morning accused him of cutting the ticket. The appellant thought they might be the persons who had threatened him on the telephone; in fact he asked them if they were. Now in these circumstances, and in view of the facts which had caused Gallagher, Mrs. Gallagher, Dryden and Kirby to be congregated there, can it be doubted that they would know whether Mike Davis said to appellant, "Here's your men," or whether he said to the four men, "There's your man?"

Appellant answers by saying the application alleged he was "unable to prove such facts by any other witness, whose testimony can be so readily procured;" and that this allegation cannot be refuted by counter-affidavits, or subsequent testimony at the trial, citing State v. Good, supra, 132 Mo. 1. c. 130, 33 S. W. 1. c. 795. Without going into that question, we need only to point out that there are recent decisions wherein the overruling of an application for a continuance because of the absence of a witness has been held not to be prejudicial error, when evidence adduced at the subsequent trial showed proof of the character sought was available to the party. [State v. Naylor, 328 Mo. 335, 40 S. W. (2d) 1079, 1082; State v. Tracy, 294 Mo. 372, 380-1, 243 S. W. 173, 175.] True enough, in these two cases the other witnesses whose testimony was available to the defendant were actually used at the trial, so that the testimony of the absent witness would have been cumulative. But it makes no difference whether the defendant uses the witnesses if they are available. In the instant case the record shows the witnesses Harry Gallagher and Mrs. Gallagher were friendly to the appellant, Dryden and Kirby were aligned with them in interest, the boy Keller was working under appellant, and all of them resided in Jackson County. For the several reasons stated our conclusion is that the trial court did not abuse its discretion in overruling the application for a continuance.

II. The next assignment predicates error on the refusal of the trial court to require the prosecutor to permit appellant's counsel to inspect a paper which the State's witness Larwood, an eighteen year old boy, used to refresh his memory during direct examination. The prosecutor had just asked the witness if he saw the appellant come out of the restaurant (after the shooting) and the witness had answered that he did not, though he heard a shot fired at that time. Thereupon the following occurred:

"Q. Jimmy, I am going to hand you this piece of paper that appears to have your signature on it and ask you to please refresh your memory a little bit before you answer any further questions.

482

"MR. O'HERN: Start with the first of it.

"Q. (By MR. GRAVES) Yes, start with all of it; and read every part of it.

"MR. RUCKER: What paper was that you handed him?

"MR. GRAVES: That is my paper.

"MR. RUCKER: We have a right to know what paper the witness is using.

"MR. GRAVES: I said a paper with his signature on it.

"MR. RUCKER: That is hardly sufficient. I am asking the court to order the prosecuting attorney to show us the paper he is handing the witness for the purpose of having the witness refresh his recollection.

"THE COURT: Well, if it is any document to refresh his memory it is proper for him to look at it.

"MR. RUCKER: I would like to know what document that is.

"THE COURT: You will discover that if it is offered.

"MR. RUCKER: If Your Honor please, I have a right to examine the paper from which the witness refreshes his recollection.

"THE COURT: It has not been offered. If it is offered you may examine it as long as you want to. (Exception saved.)

"Q. (By MR. GRAVES) After refreshing your recollection I will ask you to tell the jury whether or not you saw the defendant John Gadwood after the shot was fired come out of that restaurant? A. Yes, sir."

The direct examination continued thereafter for ten pages in the record and covered what transpired in the street after the men came out of the restaurant. No further reference to the memorandum which had been submitted to the witness was made either by the State or the defense; and appellant's counsel did not renew their request to inspect it when they cross-examined the witness immediately after the direct examination. Appellant has cited several Missouri cases holding that where a document is used by a witness on the stand to refresh his recollection, the adverse party has the right to inspect it, and, if so advised, to cross-examine from it, such as State v. Patton, 255 Mo. 245, 254, 164 S. W. 223, 225. That doctrine is almost universal, though the complaining party does not necessarily have the right to interrupt the other party's examination of the witness to inspect the document, as appellant's counsel sought to do in this case. Most of the authorities indicate it is enough if the right of inspection is granted in aid of the cross-examination of the witness; but the better rule seems to be that the matter rests within the discretion of the trial court. [Morris v. United States, 149 Fed. 123, 9 Ann. Cas. 558, 562, note; Green v. State, 53 Tex. Crim. Rep. 490, 110 S. W. 920, 22 L. R. A. (N. S.) 706, note; State v. Bacon, 41 Vt. 526, 98 Am. Dec. 616, note; 70 C. J., sec. 769, p. 597; 28 R. C. L., sec. 186, p. 596; 2 Wigmore on Evidence (2 Ed.),

secs. 762, 765; 1 Greenleaf on Evidence (16 Ed.), sec. 747, p. 573; 3 Wharton's Criminal Evidence (11 Ed.), sec. 1279, p. 2147; 5 Jones Commentaries on Law of Evidence (2 Ed.), sec. 2392, pp. 4706-7.]

This court en banc has held the prosecuting attorney cannot be compelled to produce the written statements of witnesses and other books and papers in his files for inspection by the defendant in a criminal case *in advance of the trial,* State ex rel. Page v. Terte, 324 Mo. 925, 25 S. W. (2d) 459. But that is a very different thing from saying defendant's counsel cannot inspect a paper or other memorandum used by a State's witness to refresh his memory *while he is testifying,* unless the State later elects to offer it in evidence. Such a course would open the door wide to fraud and perjury. The law is all the other way, and the trial court erred in holding as it did.

But while that is true, the error was harmless in this instance. The inquiry which prompted the prosecutor to refresh the memory of the witness was whether he saw the appellant come out of the restaurant after the shot was fired. Before seeing the memorandum the witness answered that he did not, and after seeing it he said he did. The appellant admitted he was in the restaurant when the shot was fired and that he ran out immediately afterwards. In other words the appellant admitted the truth of the fact stated by the witness after he had refreshed his memory from the memorandum. The subsequent testimony of the witness did not substantially conflict with appellant's showing. The denial of the right of inspection therefore did not prejudice the appellant. [Taylor v. United States, 19 Fed. (2d) 813, 818 (25); People v. Sieber, 201 Cal. 341, 352, 257 Pac. 64, 69(9); Souza v. Sieber, 22 Cal. App. 179, 352; Little v. United States, 93 Fed. (2d) 401, 406.]

III. The next nine assignments complain of the exclusion of evidence. It was the State's theory that the appellant with the aid of Mike Davis recruited the gangsters who shot Flacey and that there was a conspiracy between them to kill him. Appellant contends that in refuting this theory his *intention* was a vital element in the case, and that any evidence throwing light thereon was relevant and material. As bearing on that question he offered to testify that at a meeting of his party workers on Sunday two days before the election and homicide he addressed them and warned them to avoid all disputes and troubles at the polls, to refrain from the use of intoxicants and from carrying firearms, and to run away from trouble if it occurred. On objection by the State the evidence was excluded, and appellant maintains this ruling was error, citing State v. Young, 119 Mo. 495, 522, 24 S. W. 1038, 1046; State v. Brandon, 76 Mo. App. 305, 310; State v. Matthews, 20 Mo. 55;

State v. Graham, 46 Mo. 490; Koonse v. Mo. Pac. Railroad Co., 322 Mo. 813, 827 (IV), 18 S. W. (2d) 467, 472.

We are clearly of the opinion that the evidence was properly excluded. What the appellant said to his political subordinates in an address two days before the homicide was self-serving and therefore incompetent. Of the cases cited by the appellant only the Young case need be considered; the four others are so different in their facts that they may be passed without discussion.

In the Young case the defendant was charged with the murder of his hermit father, who was found in his home shot and dead on December 6, 1892. It was shown that the defendant had gone alone upon the premises about the time of the homicide. He produced a witness who offered to testify that on November 8 (general election day that year) the defendant told him he (the defendant) intended to go to his father's home in a short time to get some clothes. The evidence was excluded, but this court held it should have been admitted to rebut the suggestion of secrecy or concealment in his visit and to show the lawful purpose thereof. The statement was further ruled to be a part of the *res gestae*. The opinion concedes an accused cannot by his own acts and declarations make evidence in his own favor; but holds that evidence of the lawful intent with which an act was done is competent to disprove its criminality. We do not find the case has ever been cited since on these points.

If the statement made by the defendant in this Young case nearly a month before the homicide *was* a part of the *res gestae* we have no quarrel with it; for the necessary element of spontaneity *excludes* the idea of design or fabrication, State v. Stallings, 334 Mo. 1, 7, 64 S. W. (2d) 643, 645; Bennett v. Hader, 337 Mo. 977, 983, 87 S. W. (2d) 413, 416, 101 A. L. R. 1190. But if the decision means to hold that prior (or subsequent) statements of a defendant showing a good intent must be received as exculpatory evidence regardless of whether they are part of the *res gestae*, then the holding is flagrantly wrong and in conflict with a long line of decisions banning self-serving declarations. [9 West's Mo. Digest, sec. 413, p. 213.] We need only cite two recent cases, State v. Harris, 334 Mo. 38, 45, 64 S. W. (2d) 256, (9); State v. Perkins (Mo. Div. 2), 92 S. W. (2d) 634, 638 (2). In this case the speech made by the appellant to his party workers two days before the election plainly was not a part of the *res gestae*. Neither did it have such a connection with the unanticipated events that transpired during the election as to make it relevant and material. We are justified in saying that because the appellant did not follow his own advice.

There was some evidence (only a part of which has been stated) that after the homicide the appellant fled and could not be found for several days. He contends proof of his address to his party workers aforesaid was competent also to explain his flight—to show his

intent. was to run away from trouble and not from arrest... What we have said above sufficiently disposes of that contention.

The appellant had two conversations with Hymie Ballew on election day, one in the morning at the polling place for the Thirty-second Precinct of the Sixteenth Ward at Seventy-second Street and Prospect Avenue, and as will be remembered, another later in the afternoon when he went again to that precinct with the men whom Mike Davis had brought to his club room. Touching these two conversations he complains of the exclusion of evidence as follows:

He offered to testify, but was not permitted to do so, that on the occasion of the morning conversation Ballew was armed; that his words, manner and attitude were threatening; and that Ballew threatened him with physical violence if he continued to cut the entire Democratic ticket; but that he finally satisfied Ballew by convincing him he was only scratching one candidate, Benton. Appellant also offered to prove by witness Newlin that he saw appellant and Ballew engaged in the morning conversation in a group of men, some of whom were Italians; that Ballew was armed; and that the appellant and Ballew seemed to be arguing. Appellant further offered to prove by the witness Kingsbury that about the same hour and at the same place he saw Ballew in company with Cappo, the Italian later shot and killed by Flacey, and some unidentified men.

With reference to the afternoon conversation, appellant testified Ballew threatened him three or four times and told him if he did not prove he was not cutting the whole ticket they were going to take him for a ride. To prove he was scratching only Benton he started out with Ballew's men in their car and went to the polling place where the homicide was committed. He further offered to prove by the witnesses Newlin and Dodds, who saw but could not hear the afternoon conversation, that the attitude of Ballew and appellant appeared hostile.

The appellant further complains of the rejection of proffered testimony by the witnesses Kane and Saighman that they saw Ballew and Cappo about five P. M. in a car at another precinct at Forty-third Street and Prospect Avenue; and by the witness Griffin that about noon at still another precinct at Seventieth Street and Prospect Avenue, Ballew and three other men, one of whom was Cappo, slugged the witness because he refused to stop scratching Benton.

Appellant's theory was that he had the right to introduce any circumstantial evidence tending to disprove the alleged conspiracy between him and the gangsters who killed Flacey; that if proof of acquaintance and friendship between him and them would tend to establish the conspiracy, as has been said, 1 Wharton's Criminal Evidence (11 Ed.), section 244, page 288, then *e converso*, proof of dislike or enmity would tend to establish the opposite: that he should have been permitted to show the gangsters were minions of Ballew;

and that they shot Flacey of their own volition and not at his instigation. Appellant says this was all a part of the *res gestae*. He also contends that he had a right to prove the dangerous character of the men to explain why he fled from the scene of the homicide—through fear.

If it were not for appellant's own explanations and admissions, perhaps this might be true (except as to the *res gestae*). It might be conceded the foregoing evidence tends to connect Ballew with the gangsters. But appellant's own testimony is that Ballew and his squad were angry with him only because they believed he was cutting the whole ticket. They did not seriously object to his scratching candidate Benton alone. He had tentatively convinced them that was all he was doing; and when he set out on the trip with them it was to make proof of the fact in other precincts. Nothing occurred before the shooting, so far as the record shows, to raise doubt in their minds on that point. The appellant did not testify the gangsters really were shooting at him and hit Flacey by mistake in the restaurant. It is inconceivable that they would have taken him there to kill in public, if they had wanted to kill him. On the other hand Flacey was regular—was voting the whole ticket the same as Ballew and his men. Even if they were suspicions of appellant it would not explain their killing their own partisan.

Furthermore we cannot see that evidence of Ballew's vicious nature and his swashbuckling around the various polling precincts that day would have any tendency to show why appellant fled from the affray. Ballew was not present at the shooting; and the best evidence of the vicious nature of the gangsters was the homicide, itself. This is not like a case in which unconditional threats had been made against a party, or threats on a contingency which had happened. And any belligerent conduct or threats of Ballew not communicated to appellant could not be the cause of his flight in any event. We think the court did not err in excluding the proffered testimony.

IV. At the close of all the evidence the appellant requested the court to give nineteen instructions of which the court gave eleven and refused eight. Error is assigned first in the refusal of one of these, Instruction C on circumstantial evidence. It is the law, of course, that such an instruction need not be given where there is any direct evidence of the defendant's guilt; the evidence must be purely circumstantial. [State v. Sandoe, 316 Mo. 55, 64, 289 S. W. 890, 893 (8).] Appellant concedes that in his reply brief where he says: "The issue on this point narrows to one question, viz.: is there any *direct* evidence that defendant was a party to a conspiracy to kill Lee Flacey?" He takes the position that there is no evidence tending to prove appellant fired the fatal shot, and none showing he was

present aiding and abetting the act to be done (which would make him a principal in the second degree, and equally punishable under the statute, Section 4446, Revised Statutes 1929 (Mo. Stat Ann., p. 3052). From this he reasons the State made a prima facie case only on the theory of a conspiracy with the gangsters who participated in the affray: and as to a conspiracy, he says the gist of that is an *agreement*. His conclusion is that since there was no direct evidence of a written or oral arrangement between appellant and the gangsters to kill Flacey the case is based wholly on circumstantial evidence.

Looking back at the evidence briefly, from the State's standpoint, it will be remembered Mike Davis brought a group of men to appellant's club room saying "here's your men." Appellant talked with them a few minutes and then accompanied them to Seventy-second Street and Prospect Avenue where he conferred with their chief, Hymie Ballew. Thence he went with a carload of Ballew's men to the scene of the homicide with another car following. He inquired for Lee Flacey outside and led the men, or part of them, into the restaurant. Many of the men were armed and so was appellant. He called peremptorily for Flacey. When Flacey appeared appellant pointed a pistol at him and fired. Another shot was fired by someone in the assailing group. Then appellant ran out into the street with the gangsters. When Flacey came to the door and began shooting, the appellant fired back at him as did many others in the gang and Flacey fell dead. The appellant made an effort to get into two of the cars in which the gang had come but failed. Then he disappeared. We do not forget that appellant denies much of this, but that is the evidence for the State, allowing such inferences as we may legitimately indulge.

Under our statutes the mere act of conspiring to commit an offense is a misdemeanor of itself, even though the offense is not actually committed, and in some instances even though there be no overt act toward its commission. [Secs. 3686, 4243, 4244. R. S. 1929, Mo. Stat. Ann., pp. 3238, 2963, 2964.] In such cases the gravamen of the charge is the conspiracy, State v. Pope, 338 Mo. 919, 92 S. W. (2d) 904, 907 (7). If that were the situation here perhaps appellant would be right in saying proof of concerted action in carrying out the criminal purpose would be only circumstantial evidence of the illegal agreement. [State v. Caine, 134 Iowa, 147, 154, 111 N. W. 443, 445.] But appellant stood charged not with conspiracy but with murder. The conspiracy was merely incidental and evidentiary of the fact. And while, even in that situation also the conspiracy may be proven by circumstantial evidence, State v. Kolafa, 291 Mo. 340, 347, 236 S. W. 302, 303 (3), yet the purpose is different. In a prosecution for conspiracy the object is to prove the illegal agreement by the concerted action; in a direct charge of

crime it is the reverse—to prove concerted action by the illegal agreement.

In the instant case there was direct proof of concerted action. The appellant and many of the gangsters were armed. They came together, they shot together and they left together (or tried to). Certainly that is direct evidence that appellant was present aiding and abetting. Appellant has cited several cases holding that to render an aider or abettor guilty in like degree with a principal, under the statute, there should be evidence of his knowledge of the intention and purpose of the principal to commit the crime; that there must have been a common purpose and criminal intent. [See State v. Porter, 276 Mo. 387, 394, 207 S. W. 774, 776.] Conceding all that, there could hardly be stronger proof of it than was adduced in this case—not so much in weight as in content and legal effect. Without doubt this evidence was direct and not circumstantial.

Appellant points out that the learned Assistant Attorneys General in their brief say: "The theory of the State's case was based upon an alleged conspiracy between defendant and others. . . . Defendant was not charged nor was it the theory of the State's case that he was an aider or abettor, but rather the theory of the State's case was that there had been a conspiracy." We cannot agree to this. The court gave for the State an Instruction No. 4 which told the jury "When two or more persons knowingly act together in the commission of an unlawful act or purpose, that which either does in carrying out such unlawful act or purpose is in law the act of each of said persons." And Instruction No. 5 further told the jury if they believed from the evidence that the appellant "either alone, or knowingly acting in concert with another or others" shot and killed Flacey they should convict him. Obviously the Attorney General's office in the brief was treating the word "conspiracy" as signifying concerted action to a common purpose. [See State v. Carroll, 288 Mo. 392, 405, 407, 232 S. W. 699, 701, 702; State v. Parr, 296 Mo. 406, 419 (5), 246 S. W. 903, 907 (10.)]

From what we have said it follows that the State's case was not purely circumstantial and that an instruction on circumstantial evidence was not called for. When two or more persons are *seen* acting together in the commission of a crime it cannot be said the facts are only circumstantial evidence of their common intent. The law presumes they intend the natural and probable consequences of their acts. We do not mean to say, however, that the State was bound to rely wholly on this direct evidence; and that it could not stand also on the conspiracy theory—as against the appellant's contention that he did not participate in the shooting.

V. Appellant's thirteenth assignment charges error in the refusal of his Instruction M, which was as follows: "The Court instructs

the jury that mere presence at the commission of a crime, although such presence is for the purpose of aiding in the commission thereof, is insufficient to constitute guilt if no actual aid or encouragement is rendered the principal. ''The court gave at appellant's request another instruction which covered the gist of the refused instruction. It was Instruction O and read as follows: ''The court instructs the jury that the mere presence of the defendant at the commission of a crime is insufficient to constitute guilt of such offense.''

It will be observed the refused Instruction M is a counterpart of Instruction O except that the former adds the idea that although the appellant was present for the purpose of aiding in the commission of the crime, his presence will not convict him if he does not render actual aid or encouragement. The unqualified statement is wholly inconsistent with the State's theory of a conspiracy. A defendant may be convicted if he was a conspirator, although not participating in the commission of the crime, State v. Reich, 293 Mo. 415, 423, 239 S. W. 835, 837 (4). The refused Instruction M made no reservation or exception as against appellant's guilt if he was a conspirator, and therefore was properly refused.

VI. Appellant assigns error in the trial court's failure to instruct on assault with intent to kill or do great bodily harm, as a part of the law of the case under Section 3681, Revised Statutes 1929 (Mo. Stat. Ann., p. 3227). This is on the theory that the jury had a right to find from the evidence: (1) that there was no conspiracy: (2) that the appellant shot at Flacey in the restaurant and missed him, or inflicted the only revolver wound found on his body, which Deputy Coroner Leich testified was not fatal: (3) and that appellant then fled and took no further part in the affray.

This contention is directly contrary to appellant's trial theory. He testified he was unarmed and that he did not shoot at Flacey at all, the shot in the restaurant coming from somebody behind him. He made no request for such an instruction in the trial court; and the point is raised for the first time in his motion for new trial. But we concede for present purposes that appellant is entitled to invoke this theory though it is at war with his own testimony, State v. Creighton, 330 Mo. 1176, 1194, 52 S. W. (2d) 556, 562; and we also grant that the point was properly saved by being presented for the first time in the motion for new trial; State v. Burrell, 298 Mo. 672, 252 S. W. 709.

Section 4451, Revised Statutes 1929 (Mo. Stat. Ann., p. 3057) does expressly provide that ''upon indictment for any offense consisting of different degrees, as prescribed by this law, the jury may find the accused not guilty of the offense charged in the indictment, and may find him guilty of any degree of such offense inferior to that charged in the indictment, or of *an attempt to commit such offense,*

*or any degree thereof."* (Italics ours.) The next section, Section 4452, Revised Statutes 1929 (Mo. Stat. Ann., p. 3058), provides more generally that in all cases. "the jury or court trying the case may. find the defendant not guilty of the offense as charged, and find him guilty of any offense, the commission of which is necessarily included in that charged against him." And the general rule seems to be. that there may be a conviction of assault with intent to kill under an indictment or information charging murder—in other words assault with intent to kill is regarded as a species of attempted murder coming within the compass of a charge of murder. [31 C. J., secs. 498, 501, pp. 859, 860; 14 R. C. L., sec. 53, p. 210; 13 R. C. L., sec. 102, p. 798.]

But in spite of these statutes appellant's contention is untenable because of another statute which has been in the books for more than 100 years, Section 4443, Revised Statutes 1929 (Mo. Stat. Ann., p. 3051); Revised Statutes 1835, section 2, page 212, providing that: "No person shall be convicted of an assault with an intent to commit a crime, or of any other attempt to commit any offense, when it shall appear that the crime intended or the offense attempted was perpetrated by such person at the time of such assault or in pursuance of such attempt." The words in the statute "when it shall appear" do not mean when it shall appear conclusively or without dispute; they mean when it shall appear from substantial evidence. Such was the construction put upon them in the first case construing the statute, State v. White, 35 Mo. 500, wherein the charge was rape. The opinion said the testimony of the prosecuting witness "was of such a character as to call for the utmost caution on the part of the jury. But if full faith and credit are to be given to her statement, then the act was fully consummated, and the jury were not warranted, under our statute, in convicting the defendant of an assault with intent to commit a rape."

This construction has been followed in subsequent decisions, State v. Lacey, 111 Mo. 513, 516, 20 S. W. 238, 239; State v. Scott, 172 Mo. 536, 544, 72 S. W. 897, 900; State v. Bell, 194 Mo. 264, 91 S. W. 898; State v. Bobbitt, 242 Mo. 273, 288, 146 S. W. 799, 803. The first three of these cases say they can see no reason for Section 4443, in view of the provisions of Sections 4451 and 4452, but they nevertheless hold there is no conflict between them and follow Section 4443. Two other cases comment on the fact that the evidence there under review *conclusively* showed the consummation by the defendant of the crime charged, with no evidence to the contrary. [State v. Clark, 221 Mo. 391, 396, 120 S. W. 21, 22; State v. McCaffrey, 225 Mo. 617, 623, 125 S. W. 468, 469.] And the latest case considering the statute, State v. Mason, 322 Mo. 194, 201, 14 S. W. (2d) 611, 614 (6), declines to decide whether it applies to one who conspired but did not personally commit the offense.

. But the Scott case further observes a defendant may still be convicted of an attempt to commit a crime if the evidence *fails to show* the crime was consummated. That view harmonizes with Section 4442, Revised Statutes 1929 (Mo. Stat. Ann., p. 3048), which makes it a crime to attempt to commit an offense prohibited by law, where the defendant has done some act toward the commission of the offense *but has failed in the perpetration thereof.* (Italics ours.) And it indicates the purpose of Section 4443. Construed with Sections 4451 and 4452, supra, the three statutes evidently mean that if substantial evidence shows the crime charged was consummated the defendant cannot be convicted of a mere *attempt.* He cannot go to the jury on a charge so light in the face of a prima facie case showing the graver offense was committed; but if the State's evidence fails to establish commission of the crime and does show an attempt thereto the jury may convict on the latter theory under the original charge without the necessity of instituting a new proceeding. In the instant cause the State made a prima facie case of murder. That being so, the appellant was not entitled to an instruction on felonious assault.

VII. The next assignment complains of error in the failure to instruct on self-defense, on the theory that although the appellant and the gangsters provoked the difficulty with Flacey in the restaurant, yet they thereafter withdrew in good faith into the street and there shot and killed Flacey in self-defense after he had run to the door and begun to shoot at them. Appellant contends the killer was the principal in the first degree and that he as principal in the second degree was entitled to the same right of self-defense as his principal. This point also was raised for the first time in the motion for new trial.

The State's brief answers that in provoking the difficulty the gangsters acted with a felonious intent to kill Flacey or do him great bodily harm, as proven by their shooting him in the restaurant; and cites State v. Painter, 329 Mo. 314, 324, 44 S. W. (2d) 79, 82, where this court said: "If defendant sought and entered into the difficulty for the purpose of inflicting upon the deceased death or great bodily harm he thereby lost the right to invoke self-defense." That case is entirely without application here because it does not deal with a situation where the defendant *withdrew from the conflict.* Even though Flacey's assailants provoked the difficulty with felonious intent, still if they thereafter attempted to withdraw in good faith and that fact was apparent to the deceased, their right of self-defense was revived. [State v. Williams, 337 Mo. 884, 894, 87 S. W. (2d) 175, 180, 100 Am. St. Rep. 1503, 1511.]

This rule may seem unjust. If A initially makes a felonious assault upon B and B retaliates in kind, is it fair to say that A, after attempting to withdraw from the conflict which he put in motion, is

licensed to kill B in self-defense and go acquit, although the law recognizes B was so far excusable that if he had succeeded in slaying A the crime would have been reduced from murder to manslaughter? Where the whole conflict was within the same *res gestae*, and the retaliatory assault by the deceased was provoked by hot blood aroused by the original aggression of the defendant, there is good reason for saying the latter is not without legal fault. There are numerous cases holding that when one commits a homicide within the *res gestae* of some other felony he is perpetrating the killing is murder. [State v. Batson, 339 Mo. 298, 306, 96 S. W. (2d) 384, 389.] Efforts have been made to introduce this theory into the law of self-defense. [State v. Little, 228 Mo. 273, 304, 128 S. W. 971, 978; People v. Button, 106 Cal. 628, 39 Pac. 1073, 46 Am. St. Rep. 259, 28 L. R. A. 591; and it is followed by some courts, 30 C. J., sec. 211, p. 46.] But the rule as stated in the last preceding paragraph prevails in most jurisdictions, including Missouri. [30 C. J., sec. 223, p. 53; State v. Partlow, 90 Mo. 608, 627, 4 S. W. 14, 22, 59 Am. Rep. 31; State v. Cable, 117 Mo. 380, 385, 22 S. W. 953; State v. Adler, 146 Mo. 18, 25, 47 S. W. 794, 796; State v. Patterson, 159 Mo. 560, 60 S. W. 1047; State v. Lockett, 168 Mo. 480, 489, 68 S. W. 563, 566; State v. Little, supra, 228 Mo. l. c. 306, 128 S. W. l. c. 979; State v. Wilson, 242 Mo. 481, 499, 147 S. W. 98, 103; State v. Moncado (Mo. Div. 2), 34 S. W. (2d) 59.]

The foregoing shows there is every reason for requiring definite proof when a defendant attempts to justify a homicide on the ground that he had withdrawn from the altercation in good faith and thereby revived his right of self-defense. It is said in State v. Heath, 237 Mo. 255, 267, 141 S. W. 26, 29, there is a wide difference between a withdrawal and a retreat; that there must be substantial evidence showing an abandonment of the struggle by the defendant operating as a clear announcement of his desire for peace; and that such facts must be perceived by or made known to his adversary. Unless the latter acquires such knowledge he may pursue his assailant until he has secured himself from danger. [See, also, 30 C. J., sec. 251, p. 74.] The same work further amplifies the rule as follows, 30 Corpus Juris, section 223, page 53:

"In order that the right of self-defense may be restored to a person who has provoked or commenced a combat, he must attempt in good faith to withdraw from the combat; and he must also in some manner make known his intention to his adversary; and if the circumstances are such that he cannot notify his adversary, as were the injuries inflicted by him are such as to deprive his adversary of his capacity to receive impressions concerning his assailant's design and endeavor to cease further combat, it is the assailant's fault and he must bear the consequences. As long as a person keeps his gun in his hand prepared

.to shoot, the other person is not expected or required to accept any act or statement as indicative of an intent to discontinue the assault."

We have gone through this entire record again for the purpose of measuring the evidence by the above rules. Eleven eyewitnesses to the affray testified, but only a few of them could tell much about it. All of them agreed that after the shot or shots were fired in the restaurant the gangsters ran out into the street. One witness, North, said, after the first shot a voice called out "Don't anybody move." Appellant admitted on the stand he believed Flacey had been shot and that he so told a policeman in the street as he ran by him. Flacey got up from the floor and hopped to the front door. The same witness, North, testified that as he did so he said, "They can't get away with that." He fired at the retiring gangsters. They returned the fire promptly. The whole engagement outside sounded like a fusillade of shots. One witness, Becker, said the gangsters began shooting first; the witnesses Emma Craighead and Margaret North stated Flacey did. The gangsters who were doing the shooting at the start appeared to be in the middle of the street, which would be about fifteen or twenty feet from the restaurant door. The witness Shaw was the first man out the door when the shots were fired in the restaurant. He said he "passed pistols clear to the door." The witnesses Becker and Mary Craighead declared all the gangsters had weapons in sight after they ran out of the restaurant. One man had a shotgun under his coat and dropped it. The witnesses Larwood and Raines each saw one man with a pistol out in the street. Defendant's witness Chris. Rucker, said there was a shot from the restaurant door and then the gangsters who had run into the middle of the street turned and began firing toward the restaurant. At another place he said the men pulled their pistols out or jerked them out and began shooting. This might seem to indicate they had previously returned the weapons to their pockets; but the witness was not questioned further on the point.

While the question is somewhat close we have come to the conclusion that this evidence was not sufficiently developed to make a substantial showing of withdrawal in good faith. If the gangsters thought they had killed Flacey in the restaurant their retirement would not be an abandonment of the struggle amounting to a clear announcement of their desire for peace, after they found he was not dead. They concealed their weapons as they went to the restaurant; they had them exposed as they went out—for a time at least. Whether they were still gripping their pistols in their pockets when Rucker saw them, or what they were doing with their hands, the evidence does not show. Their violence in returning Flacey's fire shattered the glass door and front of the restaurant on one side. This and their previous conduct does not indicate repentance. Neither does it appear from the record how much Flacey could see from the front door of their attitude and

demeanor. To have submitted the question whether the gangsters were withdrawing in good faith out of a desire for peace would, in our opinion, have left the jury to guess work. We therefore overrule this assignment.

VIII. Assignment No. 16 challenges the correctness of the State's Instruction No. 7 defining manslaughter. That part of the instruction was as follows:

" 'Manslaughter' is the killing of a human being not herein declared to be murder or excusable or justifiable homicide; and the Court instructs the jury that if you find and believe from the evidence, beyond a reasonable doubt, that the defendant, John Gadwood, at the County of Jackson and State of Missouri, on the 27th day of March, 1934, with a loaded pistol and shot gun, intentionally shot and killed the said Lee Flacey, without malice and without premeditation, as these terms are hereinbefore explained, and under such circumstances that it is not justifiable or excusable homicide, and not in the lawful defense of his person, then you will find the defendant guilty of manslaughter.

• . .

" 'Excusable homicide,' as used in these instructions, means the accidental killing of another.

" 'Justifiable homicide,' as used in these instructions, means the killing of another in the lawful defense of one's person."

Appellant concedes the instruction has been approved by this court several times, the latest cases being State v. Bradford, 324 Mo. 695, 705, 24 S. W. (2d) 993, 996, and State v. Frazier, 339 Mo. 966, 978, 98 S. W. (2d) 707, 714. His first contention is that the instruction is self-contradictory because it permits the jury to find the appellant *intentionally* killed Flacey *without malice*. The State's Instruction No. 2 defined malice as "an unlawful state of mind and such state of mind as one is in who intentionally does an unlawful act." (This definition is taken from State v. Hottman, 196 Mo. 110, 119, 94 S. W. 237, 238.) Appellant asks how can one intentionally kill without malice when, under the aforesaid definition, the intentional doing of the unlawful homicide act itself would be malicious.

Malice is the essential ingredient of murder; to be manslaughter the killing must be without malice. Yet the common law and the statute law of this State have always recognized that a homicide may be manslaughter though intentional, as where one kills another in a transport of passion aroused by "adequate," "lawful" or "reasonable" provocation. [State v. Ellis, 74 Mo. 207, 215; State v. Edwards, 70 Mo. 480, 483.] The doctrine is a concession to human frailty and proceeds on the theory that the malice is submerged or purged by the provocation. Nevertheless through all the years this court has defined malice in homicide cases as "a wrongful act done intentionally without just cause or excuse." Judge SCOTT said in State v. Schoenwald, 31 Mo.

147, 157, that is the best definition of malice to be met with in the books. But the fact is, as other definitions often have said, that malice is a general malignancy of purpose "which prompts a person intentionally to take the life of another without just cause, justification or excuse, and signifies a state of disposition that shows a heart regardless of social duty and fatally bent on mischief." [State v. Young, 314 Mo. 612, 630, 286 S. W. 29, 34.]

State v. Gore, 292 Mo. 173, 187, 237 S. W. 993, 997, holds that since the enactment in 1919 of Section 3988, Revised Statutes 1929 (Mo. Stat. Ann., p. 2793), abolishing the degrees of manslaughter, an instruction following the statute is sufficient. The statute provides "every killing of a human being by the act, procurement or culpable negligence of another, not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." The Gore case holds this statute departs from the common law and makes every homicide manslaughter unless it is murder, or justifiable or excusable; and that it is no longer necessary to define heat of passion and reasonable provocation in instructions on manslaughter, though that was required before the statute was changed. Nevertheless the statute still contemplates that there can be no malice in manslaughter. And so, if a killing be intentional and an instruction is given defining malice as meaning the intentional doing of a wrongful act without justification or excuse, there is some ground for contending an instruction on manslaughter still should include the facts which eliminate the malice and reduce the crime from murder to manslaughter.

But, while recognizing the appellant has raised a "dignified" question, it is unnecessary for us to decide it here. For if there be error in instructions 2 and 7, it is error in appellant's favor. Unless the killing of Flacey was justifiable or excusable it was either murder or manslaughter. The point made by appellant goes to the question of assisting the jury in deciding whether it was the one or the other. If the instructions ought to have had more in them to warrant a conviction of the lesser offense rather than the greater, appellant cannot complain, because he was convicted only of manslaughter.

But appellant says Instruction No. 7 is further erroneous because it ignores his defense that the homicide was committed in the lawful defense of another. He cites Section 3987, Revised Statutes 1929 (Mo. Stat. Ann., p. 2792), which has been a part of our criminal code ever since 1835. [R. S. 1835, sec. 6, p. 168.] That section says "whenever it shall appear to any jury upon the trial of any person indicted for murder or manslaughter, that the alleged homicide was committed under circumstances or in any case where, by any statute or the *common law,* such homicide was justifiable or excusable, the jury shall return a general verdict for not guilty." (Italics appellant's.) He cites several cases which he contends establish the common-law doc-

trine was that one may kill in defense of *anyone* who is about to be feloniously slain. And he suggests that the gangster who shot Flacey may have believed and had reasonable grounds to believe that such action was necessary in defense not only of his own person but also of the persons of his co-conspirators. Instruction No. 7 in terms only hypothesizes *appellant's* defense of his *own* person as justifying the killing.

We have already held there was no evidence that the gangsters shot in self-defense from the street, because there was no substantial evidence that they withdrew in good faith from the previous conflict in the restaurant which they had feloniously provoked. Neither was there any substantial evidence that the shot or shots in the restaurant were fired by the gangster in self-defense. All the eyewitnesses except appellant testified that Flacey did not exhibit a weapon before the shooting. Appellant himself testified the first shot was fired by someone behind him. He said Flacey was grinding out his cigarette on the floor, facing him; that he "heard a lot of movement behind me" and then he says Flacey "raised his head and when he did he looked surprised and jerked his head past me and pulled a gun out of his pocket, like that. . . . When he jerked that gun out there was a shot fired that went right by my head, by my ear." There is nothing in this testimony warranting a substantial inference that Flacey was the aggressor and that whoever fired the shot from behind appellant was shooting in self-defense. Appellant does not even attempt to say what the men behind him were doing when Flacey started to draw his weapon. This being so, the facts do not justify an instruction on self-defense. It would rest on pure surmise.

IX. Appellant's last assignment charges prejudicial argument to the jury by the prosecuting attorney. The prosecutor attacked appellant's explanation of why he went out to Seventy-second Street and Prospect Avenue with the gangsters the afternoon of election day to confer with Hymie Ballew and why he went with them to the other precincts in the ward, in the following language. "Ridiculous. Absurd. In my opinion, gentlemen, a deliberate lie. That is the way I feel about it. That is the only way I feel about it." Again, the prosecutor was discussing the question whether the appellant was armed at the scene of the homicide, and said to the jury: "Is there any question in your mind about the defendant having a revolver? There is none in mine."

Objections in due form were made to these remarks by counsel for appellant, and they were overruled. These rulings were not erroneous. In both instances the argument shows on its face that the prosecutor was basing his opinion on the evidence and not expressing a private opinion founded on facts outside the record. [State v. Fran-

cis, 330 Mo. 1205, 1212, 52 S. W. (2d) 552, 555; State v. Evans, 334 Mo. 914, 919, 68 S. W. (2d) 705, 708; State v. Pope, 338 Mo. 919, 92 S. W. (2d) 904, 908.] Appellant also cites this Pope case, along with State v. Pierson, 331 Mo. 636, 649, 56 S. W. (2d) 120, 125, and State v. Taylor, 330 Mo. 1036, 1047, 51 S. W. (2d) 1003, 1006. An examination of these decisions will show the argument condemned in them was very different from that considered here.

Later in his argument the prosecutor was commenting on the testimony that after Flacey had been shot he hopped to the front door of the restaurant and began to shoot. The prosecutor said: ''He had a right to pull a gun. He had a right to carry a gun. He was an officer of the law.'' Thereupon counsel for appellant objected that on election day when doing election work, no officer had a right to carry a gun around the polling place. The prosecutor answered ''He was not in the polling place; he was in the restaurant.'' Appellant's counsel rejoined ''I object to the argument'' and the objection was overruled.

Appellant's brief cites Section 3975, Revised Statutes 1929 (Mo. Stat. Ann., p. 2773), which forbids any person carrying concealed or deadly weapons to approach within 100 yards of a polling place during an election, or then and there to display or use the same; and Section 4029, Revised Statutes 1929 (Mo. Stat. Ann., p. 2835), which prohibits any person from going to any election precinct on any election day with weapons concealed or exposed about his person. This section excepts legally qualified sheriffs, police officers and other persons whose *bona fide* duty is to execute process, make arrests, or aid in conserving the public peace.

In connection with these statutes appellant refers us to State v. Clayton, 100 Mo. 516, 521, 13 S. W. 819, 820, 18 Am. St. Rep. 565, wherein it was held error to admit testimony that the deceased was town marshal when he was killed by the defendant, there being no evidence that he was acting in that capacity at the time. Another case cited is State v. Jamerson (Mo. Div. 2), 252 S. W. 682, 686 (3). There the State was permitted, over objection, to prove the deceased (a physician) had been sworn in as a town policeman and outfitted with a pistol and holster, which he was wearing when killed. The defense was self-defense with knowledge that deceased was armed. In argument the State's counsel proclaimed that deceased ''did like any other good, law-abiding citizen would have done; he said, 'I want the right to carry a gun to protect myself,' and he was empowered by the city council . . . to do that.'' The opinion held the admission of the evidence was error and that the argument picturing the deceased as a law-abiding citizen and the defendant as a lawbreaker was prejudicial. In still another case, State v. Isaacs (Mo. Div. 2), 187 S. W. 21, the argument of the State's counsel that ''if defendant

had not been violating the law by carrying a revolver (the deceased) would not have been killed," was held improper.

On the other hand, this same Isaacs case quotes the second of the following two paragraphs from State v. Heath, 221 Mo. 565, 593-4, 121 S. W. 149, 157-8. We insert the first quoted paragraph because of its bearing on the point here under discussion.

"The defendant was not upon trial for carrying a concealed weapon, and while in the progress of the trial he had the right to explain why he had a weapon, yet manifestly it will not be seriously contended that a jury would undertake to abridge or in any way lessen the defendant's right of self-defense if the facts and circumstances warranted the exercise of such a right, from the mere fact that he had in his possession a pistol. . . .

"Obviously the fact as to whether he was in the possession of a pistol and had a right to carry it, or was carrying it unlawfully, has no tendency to prove or disprove any of the issues submitted to the jury. The overshadowing question, so far as this proposition is concerned, is as to the use made of such pistol at the time of the difficulty. . . . "

Likewise in State v. Davis, 284 Mo. 695, 706, 225 S. W. 707, 710, counsel for the State argued to the jury that the deceased, a justice of the peace, had a right to carry a revolver; and that he also had that right because the defendant had threatened him within a half hour of the homicide. This court said:

"It is not proper for counsel to state any law applicable to the case not embodied in the written instructions to the jury. It is probable that defendant wasn't harmed by the statement that a justice of the peace, as a conserver of the peace, had a right to carry a weapon under the laws of the State. Section (4029, Mo. Stat. Ann., p. 2835) excepts from the penalty for carrying concealed weapons certain officers, including persons whose bona-fide duty it is to aid in conserving the public peace. A justice of the peace is made a conserver of the peace by several sections of the statute." (The opinion goes on to hold, however, that counsel's statement that the deceased justice had a right to carry a pistol because his life had been threatened a short time before, was clearly "outside his duty.")

As already stated, Section 4029 excepts sheriffs from the prohibitions against carrying deadly weapons. And by Section 11518, Revised Statutes 1929 (Mo. Stat. Ann., p. 7435) they are made conservators of the peace and are charged with the general duty of quelling and suppressing assaults and batteries, riots, routs, affrays and insurrections. Deputy sheriffs are invested with the same powers by that section and Section 11514, Revised Statutes 1929 (Mo. Stat. Ann., p. 7434). They are thus brought within the ruling in the Davis case. last referred to above.

In the instant case, during the cross-examination of the witness Dorothy Perry appellant's counsel elicited the fact that during election day Flacey remarked to her he might encounter violence and that he had "the difference," meaning, as she understood, that he was armed. Presently in the direct examination of a later witness, Margaret North, the State proved without objection that Flacey was a deputy sheriff. When the State's counsel referred to that fact in his argument to the jury appellant's counsel objected on the ground that when the affray occurred Flacey was doing election work and had no right to carry arms around a polling place. As a matter of fact at that time he was in the restaurant. Besides, Section 4029, supra, applying to sheriffs does not say that.

But we need not go into that question. The argument was improper, because it was outside the law declared in the instructions. And yet we agree with the Heath and Davis cases that it was not prejudicial. There was no dispute about the fact that Flacey had a pistol and fired it. The only question was whether his conduct was such as to entitle the gangsters to kill him in self-defense. If he was the one that was acting in self-defense he had a right to shoot whether he was an officer or not. There was nothing inflammatory about the argument, and we are not authorized to overturn the conviction because of it.

We have covered all the assignments made by appellant. His counsel have presented his case with marked industry and ability. But after careful and prolonged consideration we feel constrained to affirm the judgment. It is so ordered. All concur.